**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
TRACI L. SHAFROTH (Cal. Bar No. 251673)
(tshafroth@kbkllp.com)
JAY R. MINGA (Cal. Bar No. 293744)
(jminga@kbkllp.com)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone:    (415) 496-6723
Facsimile:    (650) 636-9251

*Attorneys for Lugano Diamonds & Jewelry Inc.*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>Simba IL Holdings, LLC,<br><br>            Debtor and Debtor in<br>            Possession. | Case No. 8:25-bk-12616-MH<br>Chapter 11<br><br>Assigned to Hon. Mark D. Houle<br><br>**OBJECTION OF LUGANO DIAMONDS & JEWELRY INC. TO MOTION FOR ORDER APPROVING SETTLEMENT**<br><br>**Hearing Date:**<br>Date:   March 17, 2026<br>Time:  2:30 p.m.<br>Place:  Courtroom 6C<br>         411 West Fourth Street<br>         Santa Ana, CA 92701 |

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

Lugano Diamonds & Jewelry Inc. ("<u>Lugano</u>"), by and through its undersigned counsel of record, hereby files this objection (the "<u>Objection</u>") to the *Motion for Order Approving Settlement* (the "<u>Motion</u>") filed by Simba IL Holdings, LLC, the debtor and debtor in possession herein ("<u>Simba</u>" or the "<u>Debtor</u>"). In support of the Objection, Lugano respectfully states as follows.

## I.    PRELIMINARY STATEMENT

Underlying Simba's chapter 11 case (the "<u>Chapter 11 Case</u>") is a potentially fraudulent transfer of real property valued in Simba's schedules at $30 million for no consideration, orchestrated by Mordechai Ferder ("<u>Ferder</u>"), the former CEO of Lugano. This transfer, deeded by Ferder from abroad after he fled the United States, is of a piece with Ferder's wide-ranging alleged fraud that subjected Lugano to nearly 60 claims from defrauded "investors," as well as a dozen lawsuits, all of which ultimately drove Lugano into a liquidating Chapter 11 bankruptcy case last November.

Bryan Gadol and Darren Testa, with whom Simba seeks to enter the settlement agreement that is the subject of the Motion (the "<u>Settlement Agreement</u>"), are among those claimants, but they appear to be differently situated from the others. Gadol and his law firm, Holland & Knight, provided legal advice to Lugano and/or Ferder, including in the negotiation of a credit agreement with Lugano's parent company that would appear to have restricted Lugano's ability to enter into the agreements Gadol and Testa purported to enter into with Lugano and Ferder. And when Ferder's alleged fraud came to light, Gadol and Testa acted with remarkable dispatch, filing lawsuits in multiple jurisdictions and obtaining attachment orders attaching the property of Ferder, Simba, and related entities, obtaining liens against those properties, and ultimately securing a default judgment against Simba and others for more than two and a half times the amounts that Gadol and Testa purportedly invested pursuant to their Investment Contracts (defined below).

As with Simba's previous motion seeking an order approving a prior settlement agreement with Gadol, Testa, and a third investor, the Motion and the Declaration of Richard A. Marshack (the "<u>Declaration</u>"), Simba's Chief Restructuring Officer (the "<u>CRO</u>"), depict the settlement of Gadol and Testa's claims as straightforward breaches of guarantees for failure to pay amounts under "put right" clauses in the Investment Contracts. Mot. at 3–4; Decl. ¶¶ 7–8. The Motion and

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

Declaration do not disclose—much less discuss—Ferder's alleged fraud, which is the subject of multiple lawsuits, including by Lugano, Gadol, Testa, and numerous other individuals and entities, and which is central to both this Chapter 11 Case and Lugano's pending bankruptcy case. Nor is there any mention of the fraud in the Debtor's status reports.[1]

Simba has not established that its CRO has sufficiently investigated the underlying factual questions before seeking the relief requested in the motion. The Debtor's estate appears to lack the resources to do so, given that the Debtor is a holding company with no operations or revenue and which apparently will be required to rely on the Administrative Carve-Out (defined below) contemplated under the Settlement Agreement to preserve its existing assets and even avoid administrative insolvency. Mot. at 13. This is all the more reason to give Lugano and other parties in interest an opportunity to conduct discovery into, *inter alia*, the transfer of the Aspen House (defined below), the source of funds used to purchase the Alternative Investments (defined below), and the facts underlying Gadol and Testa's claims—including Gadol's relationship with Ferder, as well as Gadol's and Testa's entry into alleged investment agreements with him, despite Gadol's apparent involvement with relevant aspects of the CODI transaction.

The 21-day noticed motion period is insufficient to complete such discovery. Moreover, the terms of the Settlement Agreement favor Gadol and Testa over other creditors without sufficient explanation of why such treatment is justified and without requiring Gadol and Testa to provide even modest substantiation for the validity of their claims or their asserted liens. The Court should not reward Gadol and Testa for having won the very "race to the courthouse" that the Bankruptcy Code is designed to avoid, especially when questions remain regarding their relationship with Ferder. For these reasons, the Court should deny the Motion.

## II.    STATEMENT OF FACTS

### A.    General Background

Ferder and his wife, Idit Ferder, founded Lugano in 2004. *Declaration of Traci L. Shafroth*, Exhibit A (*Decl. of J. Michael Issa in Support of Chapter 11 Petitions and First Day Motions*, *In*

---

[1]    See generally Debtor's Status Report & Statement of Intentions [Docket No. 17] ("Initial Status Report"); Debtor's Second Status Report [Docket No. 41]; Debtor's Third Status Report [Docket No. 88]; and Debtor's Fourth Status Report [Docket No. 224].

*re: Lugano Diamonds & Jewelry Inc., et al.*, Case No. 25-12055 (BLS), United States Bankruptcy Court for the District of Delaware [Docket No. 2] ("Issa Decl.")) ¶ 7. In 2021, Compass Diversified Holding ("CODI Parent"), through its subsidiary Compass Diversified Holdings LLC ("CODI"), acquired an indirect majority interest in Lugano, with Mr. Ferder and affiliated entities retaining approximately 40% in Lugano through its indirect parent company. *Id.* ¶ 9. As part of that transaction, Lugano entered into a credit agreement with CODI.[2] *Id.* ¶¶ 26–27. Despite restrictions in that agreement on Lugano's ability to incur additional debt, Ferder entered dozens of alleged financing transactions purporting to obligate Lugano (the "Investment Contracts"). *Id.* ¶ 31. The Investment Contracts, which were outside Lugano's ordinary course of business, were generally joint investment agreements in which a third party would co-invest in a loose diamond, ostensibly for resale at a significant profit. *Id.*

On May 7, 2025, CODI Parent and CODI filed a Form 8-K disclosing that, in April 2025, CODI "commenced an internal investigation into the financing, accounting, and inventory practices of [Lugano Holding, Lugano's indirect parent], a subsidiary and operating segment of [CODI], based on concerns reported to [CODI] management as to these practices." *Id.* ¶ 30. They also reported that "[i]n connection with the ongoing investigation, on May 7, 2025, [Ferder] resigned from his position as Chief Executive Officer of [Lugano Holding], and from all offices and directorships previously held with Lugano and its subsidiaries and affiliates." *Id.*

Since the summer of 2025, approximately a dozen parties have commenced lawsuits against Lugano, Ferder, and/or other parties, and several plaintiffs unsuccessfully sought prejudgment attachments against Lugano. *Id.* ¶ 31.

On June 24, 2025, Lugano commenced an action against Ferder and a related trust for which he is a trustee, including claims for fraud, concealment, constructive fraud, and breach of fiduciary duty. *Id.* ¶ 32. The Complaint alleges that Ferder "concealed and misrepresented the nature of [the Investment Contracts,]" and that, while these contracts "created potential liabilities for Lugano," Ferder "disguised them as direct sales. He forged invoices and sale documents, sent out

---

[2] It appears that Gadol was counsel for Ferder for these transactions, as discussed below.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

empty box shipments, falsely recorded the money from the third-party individuals as revenue for Lugano, and concealed the payment obligations from Lugano's books." *Id.*

On November 16, 2025, Lugano and four affiliates filed voluntary Chapter 11 petitions.

**B.    Gadol and Testa's Claims**

As described in his Proof of Claim (the "<u>Gadol Claim</u>"), Gadol entered a number of Investment Contracts with Ferder. *Addendum to Proof of Claim (Bryan Gadol)* (the "<u>Gadol Addendum</u>") [Claim 17] at 3–6. Gadol alleges that he invested a total of $3,052,500 (*id.* at 6), yet his claim is for $11,256,049.63, nearly ***four times*** the investment amount. *Proof of Claim* [Claim 17] at 2. The difference is the result of the terms of the agreements, which purported to provide Gadol minimum returns of 10% ***per month***, compounded quarterly. Gadol Addendum at 4.

Testa, similarly, invested a total of $2,512,500 through a series of Investment Contracts entered into with Ferder (*Addendum to Proof of Claim (Darren Testa)* (the "<u>Testa Addendum</u>") [Claim 18-1] at 4), but asserts a claim for $8,146,481.53 (*Proof of Claim* [Claim 18-1] (the "<u>Testa Claim</u>"), at 2). As with the Gadol Claim, the significant difference is attributable to the terms of the Investment Contracts, which purported to provide Testa minimum returns of 10% per month, compounded quarterly. Testa Addendum at 4.

The Gadol Claim does not disclose that Gadol and his law firm, Holland & Knight, provided legal counsel to Lugano and/or Ferder, including, on information and belief, in connection with the negotiation of CODI's credit agreement with Lugano. *See also, e.g., Stock Purchase Agreement between Lugano Buyer, Inc., Ferder, as Trustee of the Haim Family Trust dated 2/24/2009, Edit Fintzi Ferder, as Trustee of the RF 2021 Irrevocable Trust dated 8/30/2021, Ferder, as Trustee of the TF 2021 Irrevocable Trust dated 8/30/2021, Simba IL Holdings, LLC, Ferder, in his individual capacity, and Ferder, as Seller Representative dated as of Sept. 3, 2021* at 64 (providing for copy of notice to be sent to Holland & Knight to Gadol's attention).[3]

**C.    Gadol and Testa's Actions, Liens, and Default Judgment Against Simba**

Prior to Simba's Petition Date (defined below), Gadol and Testa brought four actions

---

[3] available at
https://www.sec.gov/Archives/edgar/data/1345126/000134512621000039/ex992luganostockpurchaseag.htm (last visited March 2, 2026).

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

against Simba, among others, in California, Colorado, and Delaware Superior Courts, in which they obtained several attachment orders that they contend granted them a security interest in Simba's assets (collectively, the "Liens"). Mot. at 3–4. On September 16, 2025, Gadol and Testa obtained a default judgment against Simba in the Delaware action for $7,929,072.00 in favor of Gadol and $6,377.794.84 in favor of Testa (the "Default Judgment"), effective as of August 27, 2025. Mot. at 4.

### D.    Simba's Bankruptcy Case

On September 16, 2025 (the "Petition Date"), Simba filed the Chapter 11 Case. Mot. at 2. Simba is a holding company with three main assets: a portfolio of investment accounts "the Alternative Investments"), real property located at 1220 Red Butte Drive, Aspen, Colorado 81611 (the "Aspen House"), and an approximate 35% stake in the indirect parent of Lugano (the "Lugano Stock"). The Haim Family Trust, of which Ferder is a trustee, transferred the Aspen House to Simba for no consideration on September 9, 2025, less than a week before Simba filed the Chapter 11 Case. *See* Mot. at 10.

### E.    Lugano's Claims Against Simba

Lugano's claims against Simba are based on the alter ego doctrine and the California Uniform Voidable Transaction Act, California Civil Code Section 3439 *et seq*. [Claim 9-1, *Addendum to Lugano Diamonds & Jewelry Inc. Proof of Claim* (the "Lugano Addendum") at 2.] Lugano has claims against Ferder, in his individual capacity and as trustee of the Haim Family Trust, for which Lugano asserts Simba is liable under the alter ego doctrine. *Id*. Lugano also has claims against Simba under the California Uniform Voidable Transaction Act based on the Haim Family Trust's transfer of the Aspen House to Simba for no consideration (*id*.), even though the Debtor values the Aspen House at $30 million in its schedules.

### F.    The Settlement Agreement[4]

The Settlement Agreement contains the following key terms:

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

---

[4] Capitalized terms in this section not otherwise defined herein have the meanings set forth in the Settlement Agreement.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

1. The Lien against the Aspen House would be acknowledged as a valid, perfected, enforceable, and unavoidable lien securing the Gadol and Testa Claims. Mot. Ex. A (Settlement Agreement) at 5.

2. The Gadol Claim would be allowed as a secured claim in the amount of $7,929,072.00, and the Testa Claim allowed as a secured claim in the amount of $6,377,794.84, with an allowed general unsecured, nonsubordinated claim for any deficiency after liquidation of Simba's assets. *Id.*

3. After payment of amounts owed to Citi and secured by the First Deed of Trust and owed to WMCI and secured by the Second Deed of Trust, and after payment of commercially reasonable costs arising from the sale of the Aspen House, $250,000 would be paid to Simba's CRO to fund administrative costs of the Estate (the "Administrative Carve-Out"). *Id.* at 7. If the Aspen House were to be sold outside of the Chapter 11 Case or foreclosed upon, then the Estate would lose the right to the Administrative Carve-Out, which would instead be applied to pay the Gadol and Testa Claims. *Id.*

4. Gadol and Testa would have discretion to pay "property insurance premiums or other costs essential to preservation of the value" of the Aspen House. *Id.* at 6. There is no cap on such payments. *See generally id.* The total amount of such payments, less any amounts reimbursed by Simba's Estate, "shall constitute the 'Outstanding Aspen Property Maintenance Amount.'" *Id.* But the Gadol and Testa Claims are not increased by that ***net*** unreimbursed amount. *Id.* Instead, they "shall be increased dollar-for-dollar by the ***aggregate*** amount of all Aspen Property Maintenance Amounts paid by Gadol and/or Testa, respectively." *Id.* (emphasis added).

5. With respect to the Alternative Investments, Gadol and Testa would have discretion to pay any "capital call amount," an "amount necessary to avoid or cure a default, or avoid the assessment of a penalty" (each a "Capital Call Amount"), again without limitation. *Id.* at 8. As with the Aspen property maintenance payments, the total amount of the Capital Call Amounts, less any amounts reimbursed by Simba's Estate, "shall constitute the 'Outstanding Capital Call Amount.'" *Id.* But the Gadol and Testa Claims are not increased by that ***net*** unreimbursed amount. *Id.* Instead, they "shall be increased dollar-for-dollar by the ***aggregate*** amount of all Capital Call Amounts paid by Gadol and/or Testa, respectively." *Id.* (emphasis added).

6. If the Alternative Investments are sold, the proceeds would be used first to pay Closing Costs, then to reimburse Gadol and Testa for any Outstanding Capital Call Amount, then to reimburse them for any Outstanding Aspen Property Maintenance Amount. Any net proceeds would then be split 75% to the Estate and 25% to Gadol and Testa "on account of the Allowed Secured Claims." *Id.* at 9. This latter amount is not limited to any remaining unpaid amount on those claims. *See id.*

7. The Settlement Agreement includes mutual releases of Gadol and Testa, their family members, and their trusts on the one hand, and Simba, the Estate, and the CRO on the other. *Id.* at 10–11.

8. Gadol and Testa have filed essentially identical claims against the Lugano estates as they have filed here. Yet there is no provision in the Settlement

Agreement or any other agreement that would reduce their Lugano claims by any recovery they may obtain in this Chapter 11 Case, enabling them to receive a double recovery on what appear to be inflated claims.

## III.    ARGUMENT

Gadol's alleged investments total just over $3 million; Testa's total approximately $2.5 million. Yet they have asserted claims for approximately $11.3 million and $8.1 million, respectively. The Motion does not address the questionable validity of these claims, nor does it establish that the Debtor and its CRO have undertaken a sufficiently thorough investigation to justify approving the Settlement Agreement, the terms of which appear to be unjustifiably favorable to Gadol and Testa.

Prior to seeking approval of the Settlement Agreement, Simba told the Court that it "believe[d] the liens and attachment orders on the Debtor's assets are avoidable" and that it was "confident" that Gadol and Testa's claims "can be substantially reduced or disallowed in their entirety." Initial Status Report at 5. The CRO previously asserted that "[t]he stated, guaranteed rates of return were astronomical[;]" that they were "usurious under California law" (which "would void the entire interest component of the claims"); that "the counterparties likely never expected the letter of the contracts to be followed[;]" and "these sophisticated parties, who knowingly participated in these speculative deals, are barred from recovery by the equitable doctrines of unclean hands and *in pari delicto*." *Id.*

The CRO's declaration in support of the Motion does not explain what has changed between then and now. Nor does the Motion address whether the CRO considered, for instance, the potential for subordination of Gadol and Testa's Claims under Section 510 on these grounds, whether the Gadol and Testa Claims could be reduced or avoided on these grounds, or whether the alleged fraud may provide a way to avoid and/or subordinate the underlying guarantees. Further, the Declaration does not establish whether the CRO followed through on his assertion that he was considering bringing claims against Gadol and Testa for "wrongfully attaching and encumbering more of the Debtor's property than would be necessary[,]" or "for breach of contract for disregarding venue provision in the underlying agreements." *Id.* at 5. Moreover, Simba and its CRO fail to explain why Gadol and Testa should be granted allowed secured claims on the

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

1    Alternative Investments when the liens on those assets appear to be preferences obtained within

2    90 days of the Petition Date.

3        Instead, the Debtor seeks approval of a settlement of Gadol and Testa's Claims on terms

4    that reward them for having raced to the courthouse and that would likely work to the detriment

5    of other creditors, including the Lugano estates. The Settlement Agreement would deem the Lien

6    against the Aspen House unavoidable without a fight and without an even perfunctory

7    investigation by a Simba estate fiduciary. It would give Gadol an allowed secured claim of over

8    $7.9 million, a return on his $3 million investment of approximately 160% in a mere two and a

9    half years; similarly, it would give Testa an allowed secured claim of approximately $6.4 million,

10   a return on his $2.5 million investment of approximately 150% in that same period. Granting Gadol

11   and Testa such "astronomical" returns would largely enforce the highly suspicious terms of their

12   "speculative deals" that these "sophisticated parties" "likely never expected" to be followed to the

13   letter. Initial Status Report at 3, 5. The Settlement Agreement also provides an Administrative

14   Carve-Out, but only if Simba is able to sell the Aspen House in the Chapter 11 Case; otherwise,

15   those funds also go to Gadol and Testa. And WMCI already has been granted relief from stay to

16   pursue foreclosure at the end of the Sale Period. *See Order Granting Amended Motion for Approval*

17   *of Amended Stipulation Resolving Creditor's Motion for Relief from the Automatic Stay by and*

18   *Between White Mountain Capital, Inc. and Debtor, Simba IL Holdings, LLC* [Docket No. 194].

19   Further, the Settlement Agreement allows Gadol and Testa to make payments to preserve the value

20   of the Aspen House and the Alternative Investments, but only at their discretion. And related

21   provisions appear to increase the value of the Gadol and Testa Claims "dollar-for-dollar" for such

22   payments, even if they have already been reimbursed by the Estate. Additionally, if the Alternative

23   Investments are sold, net proceeds would be split 75/25 between the Estate and Gadol/Testa—a

24   seemingly arbitrary split for which no justification is provided in either the Motion or the

25   Settlement Agreement. The Settlement Agreement also provides that Gadol and Testa may be

26   reimbursed for any Outstanding Aspen Property Maintenance Amount from proceeds from any

27   sale of the Alternative Investments, despite these assets being subject to different security interests

28   that may be challenged by different parties asserting different claims. These credits stand in stark

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

contrast to what is *not* in the Settlement Agreement—any provision that would give the Lugano estates a dollar-for-dollar credit against Gadol's and Testa's claims in the Lugano cases for any recovery they obtain here.

The Debtor seeks approval of these terms, which appear to be excessively favorable to Gadol and Testa, without sufficient justification. Simba asserts that the Court should approve the Settlement Agreement because "litigation of these issues would be fact-intensive, legally complex, and would likely require significant time and expense, with no assurance of a favorable outcome." *Id*. This justification is insufficient. *See, e.g.*, *In re Greenacre*, 103 B.R. 1, 7 (Bankr. D. Me. 1995) (rejecting settlement despite concerns of the trustee and various creditors about the added expense and time required to prepare and try the case and the complexity of the issues). This is especially true here, where investigating the largest disputed claims and highly suspect liens against the estate—which could easily deprive unsecured creditors of any recovery—is the *sine qua non* of this type of Chapter 11 case.

Simba and its CRO seek the Court's approval without having undertaken any meaningful investigation of central factual issues in the Chapter 11 Case, including Ferder's alleged fraud; the source of the funds used to acquire Simba's assets; the transfer of the Aspen House to Simba for no consideration; Gadol and Testa's relationship with Ferder; and Gadol's entry into Investment Contracts with Ferder and, allegedly, Lugano, despite Gadol's apparent involvement in Lugano's credit agreement with CODI. The Motion and Declaration fail to establish that the CRO investigated these issues, or adequately evaluated Gadol and Testa's claims, potential defenses against those claims, or possible infirmities in the Liens. Nor do they explain why the CRO concluded that the attachments that occurred during the preference period underlying the Liens against the Non-Aspen Collateral (as defined in the Settlement Agreement) should be deemed "unavoidable." The Settlement Agreement merely states, without further explanation in the Motion or Declaration, that "as a compromise of the Parties' dispute as to whether the Liens against the Non-Aspen Collateral are avoidable, those Liens shall be deemed valid, perfected, enforceable and unavoidable," with the proceeds of any sale of the Alternative Investments to be split 75/25 between the Estate and Gadol/Testa. *See* Settlement Agreement at 5, 9.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

**KELLER BENVENUTTI KIM LLP**
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

1    The Debtor and its CRO have not met their obligation to "present all relevant facts to the

2  court" and to explore and advise the Court and the other parties in interest regarding, "whether

3  there is a more attractive solution than that which the trustee has negotiated." *See In re Mickey*

4  *Thompson Entm't Grp., Inc.*, 292 B.R. 415, 421 (B.A.P. 9th Cir. Apr. 9, 2003) (reversing order

5  approving compromise where better offer was available, rejecting trustee's argument that he was

6  contractually bound to seek approval of the prior offer because he believed that it was in the

7  estate's best interest when he accepted it). Because Simba has not sufficiently explained or

8  supported the "underlying rationale" for the Settlement Agreement, the Court should deny the

9  Motion. *See, e.g.*, *Kayo v. Fitzgerald*, 91 F. App'x 714, 716 (2d Cir. Feb. 3, 2004) (vacating and

10  remanding for further findings by Bankruptcy Court where "underlying rationale" for settlement

11  approval was "unclear from the record").

12    In the Debtor's Initial Status Report, it represented that "[t]he Case was filed for one reason,

13  to halt a chaotic creditor race and ensure a fair outcome for everyone." Initial Status Report

14  at 2. The Debtor criticized Gadol, Testa, and another investor involved with the prior motion for

15  settlement approval as "three sophisticated speculators" who "won a race to the courthouse,

16  securing prejudgment attachment liens on the Debtor's assets." *Id.* at 2. The Court should not

17  reward Gadol and Testa, who through this "chaotic and inequitable process" have "raced to the

18  head of the line." *Id*. at 2, 6. Neither the Motion nor the Declaration sheds any light on how and

19  why the Debtor's position has pivoted 180 degrees and how the Settlement Agreement is at all fair

20  and equitable to this estate and its creditors.

21    For these reasons, Lugano requests that the Court either deny the Motion or adjourn the

22  hearing to a future date to allow Lugano and other parties in interest to conduct discovery into the

23  key factual issues outlined above, which the Debtor and its CRO appear unwilling or unable to do.

24  DATED: March 3, 2026                    KELLER BENVENUTTI KIM LLP

25                                        By:
26                                           */s/ Traci L. Shafroth*
                                           Traci L. Shafroth
27                                           *Attorneys for Lugano Diamonds & Jewelry Inc.*

28