David M. Goodrich, State Bar No. 208675
dgoodrich@go2.law
Brett H. Ramsaur, State Bar No. 281566
brett@ramsaurlaw.com
Ryan W. Beall, State Bar No. 313774
rbeall@go2.law
**GOLDEN GOODRICH LLP**
3070 Bristol Street, Suite 640
Costa Mesa, California 92628
Telephone: (714) 966-1000
Facsimile: (714) 966-1002

Counsel for Chapter 7 Trustee
Jeffrey I. Golden

**Golden Goodrich LLP**
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| In re<br><br>SIMBA IL HOLDINGS, LLC, a Delaware limited liability company,<br><br>Debtor. | Case No. 8:25-bk-12616-MH<br><br>Chapter 7<br><br>**CHAPTER 7 TRUSTEE'S MOTION FOR ORDER APPROVING COMPROMISE OF CONTROVERSY PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF JEFFREY I. GOLDEN IN SUPPORT**<br><br>[No Hearing Required Pursuant to Local Bankruptcy Rule 9013-1(o)] |

**TO THE HONORABLE MARK D. HOULE, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR AND DEBTOR'S COUNSEL, AND PARTIES IN INTEREST:**

Jeffrey I. Golden, the chapter 7 trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Simba IL Holdings, LLC. (the "Debtor" or "Simba"), files this *Motion for Order Approving Compromise of Controversy Pursuant to Federal Rule of Bankruptcy Procedure 9019* (the "Motion"). In support of the Motion, the Trustee submits the following memorandum of points and authorities and the Declaration of Jeffrey I. Golden (the "Golden Declaration"), and respectfully represents as follows:

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

## I. INTRODUCTION

The Trustee seeks Court approval of a settlement between the Trustee and Bryan Gadol, in his individual capacity and as trustee for the Gadol Family Trust ("Gadol"), and Darren Testa, in his individual capacity and as trustee for the Testa Family Trust ("Testa" and, collectively with Gadol, the "Creditors") on the terms and conditions set forth in the proposed Settlement Agreement (the "Agreement") attached hereto as **Exhibit 1**. The Agreement resolves all issues with respect to (i) lawsuits in several jurisdictions, (ii) a judgment obtained by the Creditors against the Debtor, (iii) liens against the Debtor's financial and investment accounts, (iv) Gadol's asserted secured claim in the amount of $11,256,049.63 against all of the Debtor's assets and (v) Testa's asserted secured claim in the amount of $8,146,481.53 against all of the Debtor's assets. The Trustee believes the Agreement is in the best interests of the Estate and its creditors because, if approved, it will reduce significant claims against the Estate so that any liquidation of assets will generate a higher return to creditors. Moreover, the Agreement avoids further litigation, which could be time-consuming and costly to the Estate. The Agreement is fair and reasonable and is a valid exercise of the Trustee's business judgment. The Agreement was also entered into in good faith and was negotiated at arms' length.

The Trustee recognizes and appreciates the proposed Agreement is similar to the proposed Agreement the Debtor requested the Court approve. To that end, a redlined copy of the Debtor's agreement and the proposed Agreement is attached hereto as **Exhibit 1**. The proposed Agreement is substantively differently from the Debtor's proposed agreement as follows:

1. The Gadol allowed claim amount has been reduced from $7,929,072 to $3,688,503.00;
2. The Testa allowed claim amount has been reduced from of $6,377,794.84 to $3,176,003.00;
3. The addition of an assignment of all claims of Gadol and Testa against the Haim Trust, including all claims against the trustee of the Haim Trust, and the beneficiaries of the Haim Trust, with a 50-50 sharing of any net proceeds recovered by the Trustee between the Estate, and Gadol and Testa; and
4. The elimination of a proposed carve out to the Estate has been eliminated;
5. The elimination of any terms and conditions pertaining to the Aspen Property (defined below)[1]; and
6. The Trustee has a unilateral right to terminate the Agreement before the effective date of the Agreement.

The Trustee believes the reduction of the Gadol and Testa claims along with the assignment of their rights to the Estate provides additional value to the Estate beyond the terms of the Debtor's proposed agreement. Therefore, the Trustee requests that the Court enter an order pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 9019 authorizing him to enter into the Agreement and approving the terms of the Agreement.

## II. STATEMENT OF FACTS

### A. General Background

On September 16, 2025, (the "Petition Date"), the Debtor commenced the bankruptcy case (the "Bankruptcy Case") by filing a voluntary chapter 11 petition under title 11 of the United States Code in the Court. On May 27, 2026, the Court entered an order converting the Bankruptcy Case to chapter 7. On June 2, 2026, the Trustee accepted his appointment as chapter 7 trustee. The Trustee continues to act in his capacity as chapter 7 trustee of the Debtor's bankruptcy estate ("Estate").

---

[1] The Aspen property was sold at a foreclosure sale by Whitemountain Capital on September 9, 2026.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

The Debtor is a limited liability company organized under the laws of the State of Delaware. The Debtor's main assets are:

- a portfolio of investments;
- real property located at 1220 Red Butte Dr., Aspen, Colorado 81611 (the "Aspen Property"), which was scheduled by the Debtor with a value of $30 million, and liens of Citibank, N.A. ($11,537,500.00), Daniel Perl (Whitemountain Capital) ($6,700,000.00), Lugano Buyer, Inc. (amount disputed), and pre-judgment writs of attachment recorded by Bryan Gadol and Darren Testa (aggregating approximately $14,630,634.60); and
- an interest in an entity that wholly owns Lugano Diamonds & Jewelry Inc. ("Lugano").

The Debtor scheduled no priority unsecured claims and two nonpriority unsecured claims in the total amount of $9,050,000.[2]

**B. <u>Proofs Of Claim</u>**

On December 18, 2025, Gadol filed a claim (the "Gadol Claim") in the Bankruptcy Case asserting a secured claim in the amount of $11,256,049.63 secured by all of the Debtor's assets. The Gadol Claim was assigned Claim No. 17-1. On December 18, 2025, Testa filed a claim (the "Testa Claim" and, along with the Gadol Claim, the "Claims") in the Bankruptcy Case asserting a secured claim in the amount of $8,146,481.53 secured by all of the Debtor's assets. The Testa Claim was assigned Claim No. 18-1. Attached as **Exhibit 2** is a copy of Pages 1-3 of the Claims.

The Claims arise from the Debtor's alleged breach of its guarantee of obligations allegedly owed to the Creditors by Lugano, Lugano's former CEO Mordechai Ferder ("Moti"), and the Haim Family Trust (the "Haim Trust"), under profit-sharing agreements for

[2] Schedule E/F lists numerous nonpriority unsecured claims with either "0.00" or "Unknown" as the amount of the claim.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

the purchase of Lugano's diamond inventory, to be converted into custom jewelry, and resold.

### C. Existing Actions

Prior to the Petition Date, Creditors brought the following suits, collectively referred to as the "Existing Actions," against the Debtor, among others:

i. *Gadol, et al. v. Ferder, et al.* (Orange County Superior Court Case No. 30-2025-01488102-CU-BC-CJC) filed on June 6, 2025 (the "California Action");

ii. *Gadol, et al. v. Ferder, et al.* (Pitkin County Superior Court Case No. 2025CV30067) filed on June 18, 2025 (the "Colorado Action");

iii. *Gadol, et al. v. Simba IL Holdings, LLC* (domestication of California judgment, Delaware Superior Court Case No. N25J-01759) filed on July 2, 2025; and

iv. *Gadol, et al. v. Simba IL Holdings, LLC* (Delaware Superior Court Case No. N25C-07-026 PAW) commenced on July 2, 2025 (the "Delaware Action").

### D. Liens

The Creditors applied for and obtained the following attachment orders, (collectively referred to as the "Liens") via the Existing Actions against the Debtor, the Haim Trust, Moti, and their property:

1. *Ex Parte Right to Attach Order and Order for Issuance of Writ of Attachment (Resident)* dated June 12, 2025, filed in the California Action;
2. *Writ of Attachment* dated June 20, 2025 filed in the California Action;
3. *Order re Plaintiffs' Immediate Disposition and Ex Parte Motion for Prejudgment Writ of Attachment* dated June 23, 2025, by which the Colorado Court issued a prejudgment writ of attachment pursuant to Colorado Rules of Civil Procedure ("CRCP") § 102, (the "Aspen Writ of Attachment"), in the aggregate amount of $14,630,634.60, as to the Aspen

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Property, Pitkin County Parcel 273501316004/R008449, owned by the Haim Trust;

4. Creditors recorded the pre-judgment writ of attachment in Pitkin County on or about June 23, 2025 against the Aspen Property, at Reception No. 710102 (the "Aspen Lien");

5. *Writ of Attachment* dated July 1, 2025 filed in the California Action;

6. *Delaware Domestication of California Writ*, domesticated on July 2, 2025; and

7. *Order Granting Plaintiff's Ex Parte Motion for Mesne Writ of Attachment* dated August 18, 2025 as to the Debtor, granted in the Delaware Action.

**E. <u>Delaware Judgment</u>**

On September 16, 2025, and before the Debtor filed its Bankruptcy Petition, a default judgment (the "Delaware Judgment") was entered in the Delaware Action against the Debtor and in favor of Gadol and Testa in the amounts of $7,929,072.00 and $6,377,794.84, respectively, with a judgment effective date of August 27, 2025.

The Debtor contends that it has valid defenses and counterclaims to the Creditors' claims as alleged in the Existing Actions. The Trustee has considered the Debtor's counterclaims and factored those claims into his decision to settle with the Creditors as set forth in the Agreement.

**F. <u>Alternative Investments</u>**

The Debtor is the owner of financial and investment accounts, including accounts previously managed by Beacon Pointe Advisors, as more particularly set forth in the schedule listed on the schedules filed in the Bankruptcy Case on September 30, 2025, Dkt No. 42, on Attachment A/B – 15.2, pdf page 11 (collectively, and together with any other financial and investment accounts owned by the Debtor but not yet scheduled, the "Alternative Investments").

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**G. Employment of Professionals**

The Trustee obtained approval to employ Golden Goodrich LLP as his counsel and J.S. Held LLC as his financial advisors. *See* Docket Nos. 354, 366. Among other responsibilities, J.S. Held is assisting the Trustee in monetizing assets of the Estate, including the Alternative Investments.

## III. SUMMARY OF THE AGREEMENT

The Trustee and the Creditors (each, a "Party" and collectively, the "Parties"), have entered into the Agreement, a true and correct copy of which is attached hereto as **Exhibit 1**. The salient terms of the Agreement provide:[3]

**A. Partial Allowance of Claims.**

The Gadol Claim will be reduced to $3,688,503.00 (the "Allowed Gadol Secured Claim"), which shall be treated as a secured claim to the extent of the share of the proceeds of the disposition of the Alternative Investments distributable to Gadol and, with respect to any deficiency, as a general unsecured claim. The Testa Claim will be reduced to $3,176,003.00 (the "Allowed Testa Secured Claim" and, collectively with the Allowed Gadol Secured Claim, the "Allowed Secured Claims") which shall be treated as a secured claim to the extent of the share of the proceeds of the disposition of the Alternative Investments distributable to Testa and, with respect to any deficiency, as a general unsecured claim.

**B. Assignment of Claims Against Haim Trust.**

The Creditors have agreed to assign all claims the Creditors hold against Haim Trust, its trustee or trustees, its beneficiaries, and any res of the trust, to the Estate ("Assigned Claims"). Any proceeds from the Assigned Claims will be split, after payment of all professional fees, expenses and other costs associated with the Trustee's pursuit of the Assigned Claims, as follows: (i) 50% to the Estate; and (ii) 50% to the Creditors on account of their Allowed Secured Claims.

---

[3] Parties are advised to consult the Agreement for all terms and conditions.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**C. Disposition of Proceeds from Alternative Investments.**

Any dividends, income, or other non-sale proceeds (collectively, "Alternative Investment Non-Sale Proceeds") of the Alternative Investments (whether received by the Estate prior to, or after, the Effective Date) will be split as follows: *first*, to reimburse the Creditors for any Outstanding Capital Call Amount; and, *second*, after the Outstanding Capital Call Amount has been repaid in full to Creditors, the balance of the Alternative Investment Non-Sale Proceeds to be split (i) 75% to the Estate; and (ii) 25% to the Creditors on account of their Allowed Secured Claims.

**D. Disposition of Other Collateral.**

The Allowed Secured Claims will remain secured by additional assets (excluding the Aspen Property and Alternative Investments, the "Additional Collateral"). If any Additional Collateral generates any proceeds ("Other Collateral Proceeds"), and should such Other Collateral Proceeds become available to the Estate after satisfaction of any senior liens on those Other Collateral Proceeds (if any such senior liens exist), then such Other Collateral Proceeds shall be used, *first*, to pay any closing costs of any sale thereof; and *second*, to reimburse the Creditors for any Capital Call Amount. After paying such amounts, the net Other Collateral Proceeds shall then be split as follows: 75% to the Estate; and 25% to the Creditors on account of the Allowed Secured Claims.

**E. Dismissal of All Existing Actions Against Debtor.**

Within 10 business days of the effective date of the Agreement, the Creditors will dismiss their claims against the Debtor.

## IV. MEMORANDUM OF POINTS AND AUTHORITIES

**A. Standard for Approving a Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019(a)**

Federal Rule of Bankruptcy Procedure 9019(a) provides:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor,

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

The standard to be applied to the approval of a settlement includes the probability of success of any litigation, the difficulties in collection on a judgment, the complexity of the matter, the expense, inconvenience or delay occasioned by resolution through litigation, and interests of creditors, and the reasonableness of the compromise. *See In re A&C Properties,* 784 F.2d 1377, 1380-81 (9th Cir. 1986), *cert. den., Martin v. Robinson,* 479 U.S. 854, 107 S.Ct. 189 (1989). Although the court is to consider the range of results in litigation, "the court's assessment does not require resolution of the issues, but only their identification, so that the reasonableness of the settlement may be evaluated." *In re Hermitage Inn, Inc.,* 66 B.R. 71, 72 (Bankr. D. Colo. 1986).

In ruling on a proposed compromise, a bankruptcy court should give substantial weight to the trustee's views as to the merits of the compromise and settlement, and should not substitute its own judgment for that of the trustee. *See In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976); *see also In re Calra Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984). Nor does the Court need to conduct an extensive investigation into the merits of the claims that the parties seek to settle. *See In re Walsh Const., Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, the court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant*, 699 F.2d 599, 608 (2d Cir. 1982); *see also In re Bell & Beckwith*, 87 B.R. 472, 474 (N.D. Ohio 1987). Consideration must also be given to the principle that the law favors compromise and not litigation for its own sake. *See Blair*, 538 F.2d at 851.

1. **<u>Probability of Success in Litigation</u>**

The Creditors obtained prejudgment writs of attachment in California, Colorado, and Delaware civil courts (collectively “Liens”). The Liens were served on the financial institutions holding the Alternative Investments before the petition date. The Creditors will likely argue the service of notice of the Liens perfected the Liens.

The Trustee believes the Liens created and recorded under California law are void *abinitio* because the liens were recorded within 90 days of the bankruptcy filing. *See* California Code of Civil Procedure 493.030(b).[4] If the Liens are not automatically void under California law, the Trustee believes the Liens may be voidable as preferences under 11 U.S.C. §§544(a)(1) and 547.

Perfection of an attachment lien occurs when the creditor secures a judgment in the action where the attachment lien is issued. *See United States v. Security Trust & Savings Bank of San Diego*, 340 U.S. 47, 50, 95 L. Ed. 53, 71 S. Ct. 111 (1950), superseded by statute as stated in *In re Estate of Romani*, 547 Pa. 41, 688 A.2d 703 (1997), aff'd, 523 U.S. 517, 140 L. Ed. 2d 710, 118 S. Ct. 1478 (1998); *Arcturus Mfg. Corp. v. Superior Court*, 223 Cal. App. 2d 187, 35 Cal. Rptr. 502, 505 (Cal. Dist. Ct. App. 1964), superseded by statute as stated in *Waffer Internat'l Corp. v. Khorsandi*, 69 Cal. App. 4th 1261, 82 Cal. Rptr. 2d 241 (Cal. Ct. App. 1999). A prejudgment, unperfected attachment lien, is a contingent, inchoate, or potential right. *See Security Trust*, 340 U.S. at 50; *Southern California Plastics*, 165 F.3d at 1246; *Bass v. Stodd*, 357 F.2d 458, 464-65 (9th Cir. 1966); *Puissegur v. Yarbrough*, 29 Cal. 2d 409, 175 P.2d 830, 831 (Cal. 1941). Upon the levy through a writ, an attachment lien is created in the creditor's favor. *In re Wind Power Systems, Inc.*, 841 F.2d 288, 291 (1988), citing Cal. Civ. Proc. Code § 488.500(a). A writ of attachment that is issued within the 90-day preference period is, however, vulnerable to attack by a trustee under §547. *In re Wind Power*, 841 F.2d at 291 (finding that perfection of a writ of attachment may relate back to the issuance of an order authorizing the writ so that the writ is no longer avoidable under §547).

Here, the Trustee must prove that the Liens are avoidable as preferential transfers of interest in property of the Debtor, and that the applicable "relation-back period" does not save the writs of attachment from avoidance under §547. The earliest date relating to the

---

[4] In Delaware and Colorado, there is no statute or other law that is akin to CCP 493.030(b) (which renders a prejudgment lien avoid upon the filing of a bankruptcy petition within 90 days of the creation of a judgment lien).

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Liens is June 20, 2025 – the date the California Superior Court issued the first of the three writs of attachment. Arguably, the California writ of attachment relates back to June 20, 2025 based upon the service of notice on of the Liens the Debtor's financial institutions. If correct, the Debtor's bankruptcy filing occurred 2 days before the expiration of the 90-day reach back period. Accordingly, the Trustee may prevail on any claim to avoid the Liens as preferences regardless of the location of issuance and the manner of perfection.

The Trustee has analyzed the Debtor's possible counterclaims against the Creditors and does not believe the pursuit of potential counterclaims will enhance the Estate. First, any counterclaim of the Debtor may be subject to offset rights of the Creditors. *See* 11 U.S.C. §553. Additionally, the Debtor did not raise any counterclaims in the California, Colorado or Delaware actions. In the Delaware action, the Creditors were awarded a judgment against the Debtor. As a result, the Debtor's counterclaims may have been foreclosed in the Delaware action as a result of the Debtor's inaction before judgment was issued against it. *See* Delaware Superior Court Rule 13(a) and Court of Chancery Rule 13(a). Should the Trustee prosecute potential counterclaims against the Creditors, the Trustee must overcome significant obstacles in order to provide value to the Estate.

This factor weighs in favor of approving the Agreement.

2. **Difficulties of Collection on a Judgment**

The Trustee does not foresee that collecting on a Judgment will be an issue in this case because the results of any litigation will render the Creditors' liens unenforceable or reduce the total claim amount owed to the Creditors. Thus, there will be no judgment to collect. This factor does not weigh in favor of approving the Agreement.

3. **Complexity of the Matter**

Any claim to avoid the Liens as preferences may be complicated if the Creditors alleged one or more defenses. Further, the legal analysis of the Trustee's claims will involve a review of applicable law in Colorado and Delaware, in addition to California. The

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

interplay between federal and state law in multiple jurisdictions may prove to be complicated and taxing on the parties and the Court.

Given the extent of legal services that may be required, this factor weighs in favor of approval of the Agreement.

4. **Inconvenience of the Delay/Best Interest of Creditors**

Should the Agreement not be approved, the Trustee will be required to litigate so that the Alternative Investments provide value to the Estate. In short, creditors will recognize a significant delay in distributions if the Agreement is not approved.

The Agreement resolves all issues relating to the Existing Actions, the Liens, the Claims, and the Delaware Judgment. Of particular note is the elimination of $12,538,025.20 in claims asserted against the Estate, from $19,402,531.16 to $6,864,506.96. By significantly reducing the allowed amount of the Claims, the Trustee has a greater chance of providing a meaningful benefit to the remaining creditors.

The Agreement provides a substantial benefit to the remaining creditors of the Debtor. This factor strongly favors approval of the Agreement.

5. **The Agreement is Fair and Reasonable and in the Best Interest of the Estate and Creditors**

Section 704(a)(1) provides that the Trustee must "collect and reduce to money the property of the estate . . . and to close the estate as expeditiously as is compatible with the best interests of creditors." 11 U.S.C. § 704(a)(1).

By entering into the Agreement, the Trustee is satisfying his statutory duties and providing the means for a distribution to creditors. The assignment of claims will enable the Estate to sell the Alternative Investments and retain a 50% share of any net recovery. The Trustee believes the Agreement is fair, reasonable, and adequate, is in the best interest of the Estate and its creditors in light of all known facts and circumstances and is a valid exercise of the Trustee's reasonable business judgment. Further, the compromise was entered into in good faith and was negotiated at arms' length. Accordingly, the Trustee requests that the Bankruptcy Court enter an order pursuant to Bankruptcy Rule

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

9019 authorizing the Trustee to enter into the Agreement and approving the terms of the compromise as agreed upon by the Parties.

**B. <u>The Motion is Appropriate Without a Hearing</u>**

Local Bankruptcy Rule 9013-1(o)(1) provides that:

> Except as to matters specifically noted in paragraph (o)(2) below, and as otherwise ordered by the court, any matter that may be set for hearing in accordance with LBR 9013-1 may be determined upon notice of opportunity to request a hearing . . .

The approval of the Motion without a hearing pursuant to the procedure established by Local Bankruptcy Rule 9013-1(o) is appropriate because it provides notice and opportunity for a hearing to all creditors and parties entitled to notice and it reduces costs to the Estate by alleviating the need for an appearance in court. The Trustee does not anticipate any opposition to this Motion.

**V. <u>CONCLUSION</u>**

Based on the foregoing, the Trustee respectfully requests that this Court enter an order granting the Motion as follows:

1. Finding that notice of the Motion is proper and adequate;

2. Approving the terms of the Agreement, a copy of which is attached as **Exhibit 1**, and authorizing the Trustee to enter into the Agreement;

3. Authorizing the Trustee to execute any documents or take any actions reasonably necessary to effectuate the terms of the Agreement; and

4. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: October 9, 2026

GOLDEN GOODRICH LLP

By: <u>*/s/ David M. Goodrich*</u>
DAVID M. GOODRICH
Attorneys for Chapter 7 Trustee
Jeffrey I. Golden

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92628
Tel (714) 966-1000 Fax (714)-966-1002

**DECLARATION OF JEFFREY I. GOLDEN**

I, Jeffrey I. Golden, declare:

1. I am the duly appointed, qualified and acting Chapter 7 trustee ("Trustee") for the bankruptcy estate ("Estate") of Simba IL Holdings, LLC. ("Debtor"). I know each of the following facts to be true of my own personal knowledge or upon information and belief and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the *Motion for Order Approving Compromise of Controversy Pursuant to Federal Rule of Bankruptcy Procedure 9019* ("Motion"). All terms as defined in the Motion are incorporated herein by this reference.

2. The Court's docket reflects that on September 16, 2025, (the "Petition Date"), the Debtor commenced the Bankruptcy Case by filing a voluntary chapter 11 petition under title 11 of the United States Code in the Court.[5] On May 27, 2026, the Court entered an order converting the Bankruptcy Case to chapter 7. Thereafter, I was appointed the Chapter 7 trustee of the Debtor's estate.

3. The Debtor is a limited liability company organized under the laws of the State of Delaware. The Debtor's main assets are:

- a portfolio of investments ("Alternative Investments");

- real property located at 1220 Red Butte Dr., Aspen, Colorado 81611 (the "Aspen Property"), which was scheduled by the Debtor with a value of $30 million, and liens of Citibank, N.A. ($11,537,500.00), Daniel Perl (Whitemountain Capital) ($6,700,000.00), Lugano Buyer, Inc. (amount disputed), and pre-judgment writs of attachment recorded by Bryan Gadol and Darren Testa (aggregating approximately $14,630,634.60); and

- an interest in an entity that wholly owns Lugano Diamonds & Jewelry Inc. ("Lugano").

[3] The case was originally assigned to the Honorable Ernest M. Robles.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92628
Tel (714) 966-1000 Fax (714)-966-1002

The Debtor scheduled no priority unsecured claims and two nonpriority unsecured claims in the total amount of $9,050,000.[6]

4. On December 18, 2025, Gadol filed a claim (the "Gadol Claim") in the Bankruptcy Case asserting a secured claim in the amount of $11,256,049.63 secured by all of the Debtor's assets. The Gadol Claim was assigned Claim No. 17-1. On December 18, 2025, Testa filed a claim (the "Testa Claim" and, along with the Gadol Claim, the "Claims") in the Bankruptcy Case asserting a secured claim in the amount of $8,146,481.53 secured by all of the Debtor's assets. The Testa Claim was assigned Claim No. 18-1. Attached as **Exhibit 2** is a copy of Pages 1-3 of the Claims. I have been advise that notices of the writs of attachment were served on the financial institutions for the Alternative Investments.

5. In order to avoid additional cost and delay of continuing to prosecute the Existing Actions, I entered into settlement discussions with the Creditors through my counsel.

6. Subject to Court approval, I have negotiated a resolution of all issues relating to the Claims, the Existing Actions, the Lien, and the Delaware Judgment including a reduction of $12,538,025.20 in secured claims asserted against the Debtor.

7. I have reviewed the Agreement, a true and correct copy of which is attached as **Exhibit 1**, and believe the compromise contemplated in the Agreement is fair and reasonable, in the best interest of the Estate and creditors, and within my sound business judgment due to the fact that the Agreement resolves all issues relating to the Claims, the Existing Actions, the Lien, and the Delaware Judgment. The Agreement also avoids the costs and delays of further litigation and allows me to move toward closing the case. The compromise was entered into in good faith and was negotiated at arms' length.

/ / /

[6] Schedule E/F lists numerous nonpriority unsecured claims with either "0.00" or "Unknown" as the amount of the claim.

8. Alternatively, continuing to negotiate with the Creditors in an effort to further reduce the debt asserted against the Estate would only increase administrative expenses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of October, 2026, at Los Angeles, California.

JEFFREY I. GOLDEN

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92628
Tel (714) 966-1000 Fax (714)-966-1002

# Exhibit 1

# SETTLEMENT AGREEMENT

This settlement (the "**Agreement**") is entered into by, between, and among:

(i) Jeffrey I. Golden, chapter 7 trustee ("**Trustee**") of the bankruptcy estate (the "**Estate**") of Simba IL Holdings, LLC ("**Debtor**" or "**Simba**"), Case No. 8:25-bk-12616-MH (the "**Bankruptcy Case**"), pending in the Bankruptcy Court for the Central District of California (the "**Court**"); and

(ii) Messrs. Bryan Gadol, in his individual capacity and as trustee for the Gadol Family Trust ("**Gadol**"), and Darren Testa, in his individual capacity and as trustee for the Testa Family Trust ("**Testa**" and, collectively with Gadol, the "**Creditors**").

The persons and entities defined in paragraphs (i) through (ii) above are periodically referred to in this Agreement as a "**Party**" and collectively as the "**Parties**."

In consideration for the execution of this Agreement, and the performance of the terms and conditions herein, the Parties agree as follows:

## RECITALS

A. On September 16, 2025, (the "**Petition Date**"), the Debtor commenced the Bankruptcy Case by filing a voluntary chapter 11 petition under title 11 of the United States Code in the Court.

B. On May 27, 2026, the Court entered an order converting the Bankruptcy Case to chapter 7.

C. On June 2, 2026, the Trustee accepted his appointment as chapter 7 trustee. The Trustee continues to act in his capacity as chapter 7 trustee of Debtor's bankruptcy estate ("**Estate**").

D. On December 18, 2025, Gadol filed a claim (the "**Gadol Claim**") in the Bankruptcy Case asserting a secured claim in the amount of $11,256,049.63 secured by all of the Debtor's assets. The Gadol Claim was assigned Claim No. 17-1.

E. On December 18, 2025, Testa filed a claim (the "**Testa Claim**" and, along with the Gadol Claim, the "**Claims**") in the Bankruptcy Case asserting a secured claim in the amount of $8,146,481.53 secured by all of the Debtor's assets. The Testa Claim was assigned Claim No. 18-1.

F. The Claims arise out of the Debtor's alleged breach of its guarantee of obligations allegedly owed to Creditors by Lugano Diamonds & Jewelry Inc. ("**Lugano**"), Lugano's former CEO Mordechai Ferder ("**Moti**"), and the Haim Family Trust (the "**Haim Trust**"), under profit-

sharing agreements for the purchase of Lugano's diamond inventory, to be converted into custom jewelry, and resold.

G. Prior to the Petition Date, Creditors have brought the following suits, collectively referred to as the "**Existing Actions**," against Simba, among others:

i. *Gadol, et al. v. Ferder, et al.* (Orange County Superior Court Case No. 30-2025-01488102-CU-BC-CJC) filed on June 6, 2025 (the "**California Action**");

ii. *Gadol, et al. v. Ferder, et al.* (Pitkin County Superior Court Case No. 2025CV30067) filed on June 18, 2025 (the "**Colorado Action**"); and

iii. *Gadol, et al. v. Simba IL Holdings, LLC* (domestication of California judgment, Delaware Superior Court Case No. N25J-01759) filed on July 2, 2025; and

iv. *Gadol, et al. v. Simba IL Holdings, LLC* (Delaware Superior Court Case No. N25C-07-026 PAW) commenced on July 2, 2025 (the "**Delaware Action**").

H. The Creditors have applied for and obtained the following attachment orders, (collectively referred to as the "**Liens**") via the Existing Actions against Simba, the Haim Trust, Moti, and their property:

i. Ex Parte Right to Attach Order and Order for Issuance of Writ of Attachment (Resident) dated June 12, 2025, as to Simba, among others, filed in the California Action;

ii. Writ of Attachment dated June 20, 2025 as to Moti, in his individual capacity and as trustee of the Haim Trust, filed in the California Action;

iii. Order: Proposed Order re Plaintiffs' Immediate Disposition and Ex Parte Motion for Prejudgment Writ of Attachment dated June 23, 2025, by which the Colorado Court issued a prejudgment writ of attachment pursuant to Colorado Rules of Civil Procedure ("**CRCP**") § 102 as to Moti, in his individual capacity and as trustee of the Haim Family Trust, and Simba filed in the Colorado Action (the "**Aspen Writ of Attachment**"), in the aggregate amount of $14,630,634.60, as to real property owned by the Haim Trust and located at 1220 Red Butte Drive, Aspen, Colorado, Pitkin County Parcel 273501316004/R008449 (the "**Aspen Property**")

iv. Recording of the Aspen Writ of Attachment on June 23, 2025. Creditors recorded the pre-judgment writ of attachment in Pitkin County on or about June 23, 2025 against the Aspen Property, at Reception No. 710102 (the "**Aspen Lien**");

v. Writ of Attachment dated July 1, 2025 as to Moti, in his individual capacity and as trustee of the Haim Trust, and Simba filed in the California Action;

vi. Delaware Domestication of California Writ, domesticated on July 2, 2025; and

vii. Order Granting Plaintiff's Ex Parte Motion for Mesne Writ of Attachment dated August 18, 2025 as to Simba, granted in the Delaware Action.

I. On September 16, 2025, and before Simba filed its Bankruptcy Petition, default judgment (the "**Delaware Judgment**") was entered in the Delaware Action against Simba and in favor of Gadol and Testa in the amounts of $7,929,072.00 and $6,377,794.84, respectively, with a judgment effective date of August 27, 2025.

J. Simba contends that it has valid defenses and counterclaims to the Creditors' claims as alleged in the Existing Actions. The Trustee continues to analyze Simba's counterclaims.

K. Simba is the owner of financial and investment accounts, including accounts previously managed by Beacon Pointe Advisors, as more particularly set forth in the schedule listed on the schedules filed in the Bankruptcy Case on September 30, 2025, Dkt No. 42, on Attachment A/B – 15.2, pdf page 11 (collectively, and together with any other financial and investment accounts owned by Simba but not yet scheduled, the "**Alternative Investments**").

L. Creditors contend that, as a result of the Liens, they have a perfected, unavoidable security interest in the Alternative Investments.

M. The Trustee disputes the validity of the Liens and contends that, to the extent they are valid, the Liens are avoidable as preferential transfers.

N. The Parties wish to resolve such disputes consensually by, among other things, agreeing to the allowance of the Claims in a reduced amount, and treating each of the Liens as valid, perfected, and unavoidable, but sharing the distribution of proceeds of the Alternative Investments between the Creditors and the Estate on the terms described in this Agreement.

O. In consideration of the mutual covenants, terms, representations and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

## ARTICLE 1
## COURT APPROVAL

1. **Binding Effect and Entry of Final Order**. This Agreement will be effective and binding only upon the entry by the Court of a final order (a "**Final Order**") granting a motion for compromise of controversy under Federal Rule of Bankruptcy Procedure 9019 that reflects the Parties' Agreement (the "**Motion**") which contains the language described in Section 6 below.

The term "**Final Order**" means an order granting the Motion and from which no appeal has been taken, and the time for taking such appeal has expired under the Federal Rules of Appellate Procedure, or, if any appeal has been taken, then: (i) no timely notice of appeal was filed, or (ii) if a notice of appeal was timely filed, then no stay pending appeal has been issued or is otherwise in effect. The date the Final Order takes effect will be the effective date of this Agreement ("**Effective Date**").

2. **No Inconsistent Actions**. No Party shall take any action inconsistent with this Agreement pending the entry of the Final Order and the resolution of any appeal of the Final Order, or the termination of this Agreement.

3. **Trustee Termination of Agreement**. The Trustee may unilaterally terminate this Agreement at any time before the Effective Date if performance of the terms of this Agreement by the Trustee becomes impractical for any reason, or if facts arise that, in the Trustee's reasonable business judgment, materially and adversely affect the Estate's position with respect to the Liens or the Alternative Investments. If the Final Order is reversed, vacated, or modified on appeal such that it no longer contains the language required by Section 6, this Agreement shall automatically terminate and the Parties shall be restored to their respective positions as if this Agreement had not been executed, without prejudice to the Trustee's right to contest the validity, perfection, or priority of the Liens

## ARTICLE 2
## TERMS OF THE AGREEMENT

4. **Partial Allowance of Claims**. The Gadol Claim shall be reduced to, and allowed as, a claim in the amount of $3,688,503.00 (the "**Allowed Gadol Secured Claim**"), which shall be treated as a secured claim to the extent of the share of the proceeds of the disposition of the Alternative Investments distributable to Gadol under this Agreement and, with respect to any deficiency, as a general unsecured claim. The Testa Claim shall be reduced to, and allowed as, a claim in the amount of $3,176,003.00 (the "**Allowed Testa Secured Claim**" and, collectively with the Allowed Gadol Secured Claim, the "**Allowed Secured Claims**") which shall be treated as a secured claim to the extent of the share of the proceeds of the disposition of the Alternative Investments distributable to Testa under this Agreement and, with respect to any deficiency, as a general unsecured claim.

5. **Validity and Perfection of Liens/Sharing of Proceeds** . The Trustee acknowledges that, as a compromise of the Parties' dispute as to whether the Liens against the Alternative Investments are avoidable, those Liens shall be deemed valid, perfected, enforceable and unavoidable, as of July 10, 2025, but subject to an agreed sharing of their proceeds, whether via sale or otherwise, as described in the terms of Section 6 below, and only after the Court approves this Agreement, should it approve this Agreement at all.

6. **Mandatory language on Effect of Creditors' Liens**. The Final Order shall include the following language:

> "For purposes of this Chapter 7 case, the Trustee, on behalf of the Estate, stipulates and the Court hereby finds that (i) Bryan Gadol shall be allowed

a secured claim (the "Allowed Gadol Secured Claim") in the amount of $3,688,503.00; (ii) Darren Testa shall be allowed a secured claim (the "Allowed Testa Secured Claim" and, along with the Allowed Gadol Secured Claim, the "Allowed Secured Claims") in the amount of $3,176,003.00, and (iii) the Liens shall be deemed valid, perfected, enforceable, and unavoidable against the Alternative Investments as of no later than the Petition Date and shall continue to secure the Allowed Secured Claims, notwithstanding conversion or dismissal of the Bankruptcy Case. Nothing in this paragraph shall be construed to create a new lien in violation of the Bankruptcy Code but rather constitutes recognition and approval of the liens existing as of the Petition Date. To the extent required, Creditors are hereby granted relief from the automatic stay to comply with their obligations under this Agreement including, but not limited to, dismissal of Simba from the Existing Actions in accordance with Section 11 of the Agreement."

The enforceability of this Settlement Agreement is contingent on the Court's order containing the aforementioned language, or similar language that is agreed to by the Parties, each acting in their reasonable discretion.

7. **Proceeds of Asset Liquidation**. Any portion of the proceeds of sale or other disposition of some or all of the Alternative Investments that is payable to the Creditors under the terms of this Agreement shall be paid to the Creditors as soon as reasonably possible following the entry of final Court orders authorizing the sale or disposition of such portion of the Alternative Investments. Any proceeds of the Alternative Investments applied to pay the Allowed Secured Claims shall be applied to pay the Allowed Gadol Claim and the Allowed Testa Claim pursuant to joint written instructions from Gadol and Testa (which may be provided via email and/or through their counsel of record identified in their proofs of claim filed in the Bankruptcy Case).

a. **Cooperation.** The Creditors and the Trustee shall work together in good faith to monetize the Alternative Investments as soon as commercially practicable to maximize their value. Such good faith cooperation will include: the Parties executing all necessary documents to implement the liquidation including the release of Liens as necessary to allow for sales to proceed, supporting all necessary motions in the Court to effectuate the same, and seeking any appropriate orders of the courts in the Existing Actions necessary to effectuate the dismissal of Simba from such Existing Actions.

i. **Reservation of rights to contest manner of liquidation.** The Creditors reserve the right to object to any sale of the Alternative Investments pursuant to 11 U.S.C. § 363, or any other motion to sell, liquidate or dispose of any portion of the Alternative Investments to the extent the Creditors believe the requested relief violates this Agreement or otherwise fails to maximize the value of such Alternative Investments.

b. **Assignment of Claims Against Haim Trust**. The Creditors hereby assign all claims the Creditors hold against Haim Trust, its trustee or trustees, its beneficiaries, and any res of the trust, to the Estate ("Assigned Claims"). Any proceeds from the Assigned Claims shall

be split, after payment of all professional fees, expenses and other costs associated with the Trustee's pursuit of the Assigned Claims, as follows: (i) fifty percent (50%) to the Estate (or any successor in interest appointed in the Bankruptcy Case) to be administered in accordance with the Bankruptcy Code; and (ii) fifty percent (50%) to the Creditors on account of their Allowed Secured Claims, after receipt of funds generated from the Assigned Claims and Court approval of any settlement, if applicable.

c. **Disposition of Proceeds from Alternative Investments.** The Parties agree to the following terms for monitoring and disposition of the Alternative Investments:

i. **Court Approval Required for Sale**. No Alternative Investment shall be sold, liquidated, or terminated prior to its maturity date, without approval of the Court after motion and notice to Creditors, the United States Trustee, and all parties requesting special notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

ii. **Cooperation as to Monitoring Alternative Investments.** The Parties understand and acknowledge that third parties (including, but not limited to, Moti, the Haim Trust, and Beacon Pointe) may possess information regarding the Alternative Investments. The Parties agree to cooperate with each other to obtain documents and information from the investment funds for the Alternative Investments and third parties (to the extent any of them possess such information), regarding the: (1) current value of investment fund interest; (2) schedule of capital contributions, distributions since inception; (3) schedule of unfunded capital commitments, approximate due dates, and any unfunded capital calls to date, including current penalties or interest; (4) impact on investment value if required capital commitments are not made; (5) remaining term of investment fund and estimated distribution schedule; and (6) copies of investment agreements. Upon their receipt, each Party shall promptly share with the other Parties all periodic reports, or other information, relevant to monitoring the value of the Alternative Investments, any capital calls, defaults, penalties or interest due on, or related to, the Alternative Investments.

iii. **Capital Calls and Preservation of the Alternative Investments**. In the event that Creditors, or the Trustee, receive notice of an upcoming deadline for Simba to pay a capital call amount, or pay an amount necessary to avoid or cure a default, or avoid the assessment of a penalty, in connection with the Alternative Investments (each such amount a "**Capital Call Amount**"), such Party shall promptly provide notice thereof to the other Party. In addition, the Trustee may request in writing (including, but not limited to, by email) that Creditors pay such Capital Call Amount in order to preserve the value of the Alternative Investments. In response to such request from the Trustee, Creditors may, but shall have no obligation to, pay any such Capital Call Amount. The total of all Capital Call Amounts funded by Creditors pursuant to this provision, less any portion of such Capital Call Amounts already reimbursed to Creditors by the Estate, shall constitute the "**Outstanding Capital Call Amount**." The amount(s) of the Allowed Gadol Claim and/or the Allowed Testa Claim shall be increased dollar-for-dollar by the aggregate amount of all Capital Call Amounts paid by Gadol and/or Testa, respectively. The Trustee shall have the right, but not the obligation, to fund any Capital Call Amount using unencumbered Estate funds in lieu of the Creditors, in which case no increase to the Allowed Secured Claims shall result, subject to Court approval.

iv. **Pre-Sale Proceeds**. Any dividends, income, or other non-sale proceeds (collectively, "**Alternative Investment Non-Sale Proceeds**") of the Alternative Investments (whether received by the Estate prior to, or after, the Effective Date) shall be split as follows: *first*, to reimburse the Creditors for any Outstanding Capital Call Amount; and, *second*, after the Outstanding Capital Call Amount has been repaid in full to Creditors, the balance of the Alternative Investment Non-Sale Proceeds to be split (i) seventy-five percent (75%) to the Estate (or any successor in interest appointed in the Bankruptcy Case) to be administered in accordance with the Bankruptcy Code; and (ii) twenty-five percent (25%) to the Creditors on account of their Allowed Secured Claims, in each case as soon as practicable after receipt of such Alternative Investment Non-Sale Proceeds by the Estate (or any successor in interest appointed in the Bankruptcy Case).

v. **Proceeds of Sale of Alternative Investments.** In the event of a sale of any portion of the Alternative Investments, the proceeds from the sale shall be used, *first*, to pay the Closing Costs (i.e., reasonable brokerage fees, transfer taxes, and other customary costs of sale); and *second*, to reimburse the Creditors for any Outstanding Capital Call Amount. After paying such amounts, the net proceeds of such sale shall then be split (i) seventy-five percent (75%) to the Estate (or any successor in interest appointed in the Bankruptcy Case) to be administered in accordance with the Bankruptcy Code; and (ii) twenty-five percent (25%) to the Creditors on account of the Allowed Secured Claims, in each case to be distributed to Creditors as soon as practicable after a Final Order of the Court approving such sale.

d. **Disposition of Other Collateral.** The Allowed Secured Claims also remain secured by additional assets (excluding the Aspen Property and Alternative Investments, the "**Additional Collateral**"). If any Additional Collateral generates any proceeds (whether by dividend, income, sale, or otherwise, and regardless of whether such proceeds are received by the Estate prior to, or after, the Effective Date) (any such proceeds referred to herein as "**Other Collateral Proceeds**"), and should such Other Collateral Proceeds become available to the Estate after satisfaction of any senior liens on those Other Collateral Proceeds (if any such senior liens exist), then such Other Collateral Proceeds shall be used, *first*, to pay any closing costs of any sale thereof; and *second*, to reimburse the Creditors for any Capital Call Amount. After paying such amounts, the net Other Collateral Proceeds shall then be split as follows: (x) seventy-five percent (75%) to the Estate (or any successor in interest appointed in the Bankruptcy Case) to be administered in accordance with the Bankruptcy Code; and (y) twenty-five percent (25%) to the Creditors on account of the Allowed Secured Claims, as soon as practicable after receipt by the Estate (or any successor in interest appointed in the Bankruptcy Case).

e. **Mandatory Language on Section 363(k) Right to Credit Bid.** The Final Order shall include the following language:

> "In the event of a sale of any portion of the Alternative Investments or the Additional Collateral, each of the Creditors shall have the right, pursuant to Section 363(k) of the Bankruptcy Code, to bid at such sale, and, if such Creditor's bid is selected as the winning bid, such Creditor may offset his Allowed Secured Claim to pay twenty-five percent (25%) of the purchase price."

8. **Allowed Deficiency Unsecured Claim.** To the extent that the disposition of the Alternative Investments is insufficient to pay the Allowed Gadol Claim and the Allowed Testa Claim in full, each of Gadol and Testa shall have an allowed general unsecured, non-subordinated claim, in the amount of any deficiency remaining on their respective Allowed Secured Claims after liquidation of the Alternative Investments. The Trustee's payment of the Allowed Secured Claims in accordance with this Section 8 and the Final Order shall be deemed made pursuant to, and protected by, the Final Order, and the Trustee shall have no liability to any party for distributions made in good-faith reliance on the terms of this Agreement and the Final Order.

9. **Payment of Settlement Amount as funds become available**. The Trustee shall pay the Creditors' respective Allowed Secured Claims as funds become available and only after entry of a Final Order by the Court authorizing the distribution of cash or other property to the Creditors, upon the liquidation, or other proceeds, of the Alternative Investments, until the Allowed Secured Claims are each paid in full. All amounts payable to the Creditors on account of their Allowed Secured Claims (including any portion of the Allowed Secured Claims that is unsecured) shall be paid according to written instructions provided by the Creditors to the Trustee's counsel.

10. **Prohibition on Priming Liens.** Upon an order of the Court approving this Agreement, should it be approved at all, the Trustee acknowledges and agrees that the Creditors' liens, security interests, and rights in and to the Alternative Investments are valid, perfected, and enforceable, and are not subject to avoidance, subordination, or priming under any provision of the Bankruptcy Code or other applicable law, including, without limitation, sections 364(d), 510, 544, 547, 548, or 549 of the Bankruptcy Code. The Trustee agrees not to seek, support, or consent to any order or relief that would grant a lien senior to, or *pari passu* with, the liens of the Creditors specifically in the Alternative Investments, without the Creditors' prior written consent; provided, however, that nothing in this Section shall restrict the Trustee's ability to seek Court approval of general estate financing, administrative-expense priority, or surcharge relief under 11 U.S.C. § 506(c) that does not encumber or prime the Creditors' liens on the Alternative Investments.

11. **Dismissal of All Existing Actions**. Within ten business days of the Effective Date, the Creditors shall file forms, as appropriate per jurisdiction, dismissing Simba from each of the Existing Actions with prejudice ("**Dismissal Requests**"). For the avoidance of doubt, nothing in this Agreement shall require that the Existing Actions be dismissed as to any defendants other than Simba.

## ARTICLE 3
## RELEASE OF CLAIMS

12. **Definition of Released Claims.** "**Released Claims**" will mean any and all claims, allegations, assertions, demands, rights, duties, obligations, contracts, agreements, covenants, promises, understandings, debts, demands, encumbrances, liens, damages, injuries, losses, actions, causes of action, costs, expenses, charges, attorneys' fees, judgments, orders, levies, and liabilities of any kind, whether in law or equity, known or unknown, and concealed or revealed.

13. **Effective Date for Releases**. The releases set forth in this Article 3 shall not be effective unless and until the Effective Date. The releases shall automatically and irrevocably become effective as of that date.

14. **Release of Simba**. Except for the obligations arising under this Agreement, and subject to the limitations of Section 16 of this Agreement, on the Effective Date, the Creditors, their family members, including Felicia Testa, their related trusts, including the Gadol Family Trust and the Testa Family Trust, do hereby release, cancel, and forever discharge the Debtor, the Trustee and the Estate (and, for the avoidance of doubt, the Debtor's and Trustee's professionals, agents and employees) from any and all Released Claims, causes of action, actions, judgments, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, arising out of or related in any way to any of the claims asserted in the Existing Actions or any other matter or claim arising out of the relationship between or among the Creditors, on the one hand, and the Debtor and Trustee on the other, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the Effective Date.

15. **Release of Creditors**. Except for the obligations arising under this Agreement, and subject to the limitations of Section 16 of this Agreement, on the Effective Date, the Trustee, on behalf of the Estate, does hereby release, cancel, and forever discharge each of the Creditors their family members, including Felicia Testa, their related trusts, including the Gadol Family Trust and the Testa Family Trust, and the Creditors' professionals, agents and employees, from any and all Released Claims, causes of action, actions, judgments, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, arising out of or related in any way to any of the claims asserted in the Existing Actions, or any other matter or claim arising out of the relationship between or among the Creditors, on the one hand, and the Debtor, the Trustee, and the Estate, on the other hand, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the Effective Date.

16. **Specific Exclusion of Release**. For the avoidance of any doubt, nothing in this Agreement releases any Released Claims causes of action, actions, judgments, trust deeds, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, against any of the following entities, their directors, officers, employees, subsidiaries, affiliates, agents, attorneys, trustees, immediate family members, and representatives: Lugano Diamonds & Jewelry, Inc., Lugano Buyer, Inc., K.L.D Jewelry, LLC, Lugano Prive, LLC, Lugano Holdings, Inc., Moti, Edit Ferder, the Haim Trust, Joshua Gaynor, Compass Group Diversified Holdings, LLC (NYSE: CODI), Beacon Pointe Financial, Luxe Maison Properties, Inc. d/b/a The Daftarian Group, Serenade Newport, LLC., Paul Daftarian, Lili Daftarian, Michael Gerro, Sahand Zargari, Jacob Wolf, White Mountain Capital Inc., and any party not specifically released herein. To the extent there is any ambiguity or inconsistency with any other provision of the Agreement, this provision controls.

17. **Release of Released Claims and California Civil Code Section 1542 Waiver.** Except for the obligations arising under this Agreement, as of the Effective Date, the Creditors, and their family members, including Felicia Testa, their related trusts, including the Gadol Family Trust and the Testa Family Trust, on the one hand, and the Debtor, the Trustee and Estate, on the

other hand, hereby forever mutually and generally release and discharge one another and each of their respective officers, directors, trustees, agents, employees, consultants, affiliates, divisions, subsidiaries, predecessors, successors, assigns, partners, shareholders, administrators, executors, principals, attorneys, insurers, and representatives from any and all Released Claims, causes of action, actions, judgments, trust deeds, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, arising out of or related in any way to the Existing Actions, the Released Claims, the Liens, or the Alternative Investments, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the Effective Date.

Except for the obligations arising under this Agreement the Parties expressly waive and relinquish any and all rights and benefits of section 1542 of the California Civil Code ("**Section 1542**"), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Notwithstanding the provisions of Section 1542, the Parties expressly acknowledge this Agreement is intended to release Released Claims they do not know or suspect to exist in their favor at the time of the execution of this Agreement. The Parties further acknowledge that they later may discover facts different from or in addition to those they now know or believe to be true regarding the matters released or described in this Agreement, and even so they agree that the releases and agreements contained in this Agreement shall remain effective in all respects notwithstanding any later discovery of any different or additional facts. The Parties expressly assume any and all risk of any mistake in connection with the true facts involved in the matters, disputes, or controversies released or described in this Agreement or with regard to any facts now unknown to them relating thereto. The Parties warrant that they have read this Agreement, including this waiver of Section 1542, and that they have consulted with or had the opportunity to consult with counsel of their choosing about this Agreement and specifically about the waiver of Section 1542, and that they understand this Agreement and the Section 1542 waiver, and so the Parties freely and knowingly enter into this Agreement.

18. **Binding Effect.** To the fullest extent permitted by law, the terms of this Agreement, including all benefits derived by any Party pursuant to the terms of this Agreement, shall be binding on all of the Parties and their heirs, successors, assigns, administrators, conservators, and executors.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

19. **Legal Capacity to Contract.** Each Party represents that it has the requisite power, authority, and legal capacity to make, execute, enter into, and deliver this Agreement and to fully perform its duties and obligations under this Agreement, and that neither this Agreement nor the performance by such Party of any duty or obligation under this Agreement will violate any other

contract, agreement, covenant, or restriction by which such Party is bound. For the avoidance of doubt, the Trustee is signing this Agreement solely in his capacity as the chapter 7 trustee and not in his individual capacity nor as a member, partner or shareholder of any non-debtor entity. Nothing contained in this Agreement shall in any way impute liability to the Trustee personally, or as a member of any professional organization, including Golden Goodrich LLP, or anyone acting on his or their behalf. The Trustee, his professionals, agents, and any successor trustee or estate representative shall have no personal liability to any Party or third party for any act or omission taken in good faith in connection with the negotiation, execution, approval, or performance of this Agreement, except for gross negligence or willful misconduct as determined by a final, non-appealable order of a court of competent jurisdiction.

20. **No Prior Assignments.** Each Party represents that it has not pledged, transferred, or assigned to any third party any right, interest, claim, or cause of action being transferred, conveyed, released, or compromised pursuant to this Agreement.

21. **No Undisclosed Inducements.** Each Party represents that it entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances, and that no representations, warranties, or promises other than those set forth in this Agreement were made by any Party or any employee, agent, or legal counsel of any Party to induce such Party to execute this Agreement.

22. **No Admission of Liability.** This Agreement was negotiated and executed for the purpose of settling the disputes described in the Agreement and effectuating the releases of Released Claims described in this Agreement. The execution of this Agreement by any Party does not constitute, infer, or evidence the truth of any claim, the admission of any liability, the validity of any defense, or the existence of any circumstance or fact which could constitute a basis for any claim, liability, or defense, other than for the purpose of enforcing the terms and provisions of this Agreement.

23. **Representation by Counsel.** Each Party represents that it has acted pursuant to the advice of legal counsel of its own choosing in connection with the negotiation, preparation, and execution of this Agreement, or was advised by the other to obtain the advice of legal counsel and had ample opportunity to obtain the advice of legal counsel or has knowingly and voluntarily agreed to proceed without legal counsel.

24. **Truth and Accuracy of Representations and Warranties.** Each of the representations, warranties, and covenants set forth in this Agreement shall be, and the Party making the same shall cause them to be, true and correct as of the time of execution of this Agreement and as of the time of the entry by the Court of the Final Order.

25. **Survival.** Each of the statements, certifications, representations, warranties, covenants, disclosures, disclaimers, waivers, and other agreements contained in this Agreement shall survive the execution of this Agreement, the payment of any settlement consideration provided for in this Agreement, and the dismissal of any legal actions referenced in this Agreement.

**ARTICLE 5**

## GENERAL TERMS AND PROVISIONS

26. **No Limitation on Third Parties**. This Agreement does not preclude or limit in any way any of the Parties' rights to pursue third parties, including but not limited to: Lugano Diamonds & Jewelry, Inc., Lugano Buyer, Inc., K.L.D Jewelry, LLC, Lugano Prive, LLC, Lugano Holdings, Inc., Moti, Edit Ferder, the Haim Trust, Joshua Gaynor, Compass Group Diversified Holdings, LLC (NYSE: CODI), Beacon Pointe Financial, Luxe Maison Properties, Inc. d/b/a The Daftarian Group, Serenade Newport, LLC., Paul Daftarian, Lili Daftarian, Michael Gerro, Sahand Zargari, Jacob Wolf, White Mountain Capital Inc., and their respective officers, directors, trustees, agents, employees, consultants, affiliates, divisions, subsidiaries, predecessors, successors, assigns, partners, shareholders, administrators, executors, principals, attorneys, insurers, and representatives from any and all Released Claims, causes of action, actions, judgments, trust deeds, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, arising in connection with any matter whatsoever, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the Effective Date.

27. **Entire Agreement.** This Agreement shall constitute the sole and entire agreement between the Parties with respect to the settlement of disputes and release of claims provided for in the Agreement. Any and all prior or contemporaneous agreements and negotiations, whether oral or written, with respect to the subject matter of this Agreement, are hereby superseded. No employee or agent of any Party has authority to orally modify any term or condition of this Agreement, or to make any representation or agreement other than as contained in this Agreement. Unless any representation or agreement is contained in this Agreement or is added pursuant to a written amendment executed by all Parties, it shall not be binding nor otherwise affect the validity of this Agreement.

28. **Amendment of Agreement.** No modification of, deletion from, or addition to this Agreement shall be effective unless made in writing and executed by each Party to this Agreement.

29. **Construction of Agreement.** The provisions of this Agreement shall be liberally construed to effectuate the intended settlement and the release of all related claims. Section headings have been inserted for convenience only and shall not be given undue consideration in resolving questions of construction or interpretation. For purposes of determining the meaning of, or resolving any ambiguity with respect to, any word, phrase, term, or provision of this Agreement, each Party shall be deemed to have had equal bargaining strength in the negotiation of this Agreement and equal control over the preparation of this document, such that neither the Agreement nor any uncertainty or ambiguity in the Agreement shall be arbitrarily construed or resolved against any Party under any rule of construction.

30. **Further Assurances.** Each Party shall promptly execute any and all instruments and documents and take all other actions that may be required to effectuate the Agreement.

31. **Gender and Quantitative Use.** Wherever the context of this Agreement may so require, the gender shall include the masculine, feminine, and neuter, and the quantitative usage of any word, term, or phrase shall include the singular and plural.

32. **Enforcement of Agreement.** Each Party to this Agreement shall have the right to enforce by proceedings at law or in equity all of the terms and provisions of this Agreement, including, without limitation, the right to prosecute proceedings at law or in equity against the person(s) who have violated or who are attempting to violate any of such terms or provisions, to enjoin such person(s) from doing so, to cause such violation to be remedied, and/or to recover damages for such violation.

33. **Waiver.** The failure by any Party to enforce any term or provision of this Agreement shall not constitute a waiver of the right to enforce the same term or provision, or any other term or provision of the Agreement. No waiver by any Party of any term or provision of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

34. **Severability.** In the event that any term or provision of this Agreement is held by any court of competent jurisdiction to be illegal, invalid, or unenforceable for any reason, then the remaining portions of this Agreement shall nonetheless remain in full force and effect, unless such portion of the Agreement is so material that its deletion would violate the obvious purpose and intent of the Parties.

35. **Tax Matters**. Each party shall be solely responsible for any and all taxes consequences and/or taxes that may be owed to any federal, state, or local taxing authority as a result of the settlement payment received under this Agreement and the agreement set forth herein.

36. **Governing Law.** This Agreement is made under and shall be construed in accordance with and governed under the Bankruptcy Code, and, if applicable, by the laws of the State of California. All Parties consent to the jurisdiction of the United States Court, Central District of California, Santa Ana Division, for the purpose of resolving any disputes which may arise under or relate to this Agreement.

37. **Retention of Jurisdiction.** The Court shall retain jurisdiction to hear any actions relating to this Agreement, including any resolution for any dispute arising from the terms of this Agreement.

38. **Counterparts.** This Agreement may be executed in any number of identical counterparts, each of which is an original, and all of which together constitute one and the same agreement. A facsimile or electronic image of a signature shall have the same force and effect as on original signature.

39. **Inurement.** This Agreement shall inure to the benefit of and be fully binding upon each of the Parties and upon their respective heirs, executors, successors, assigns, and grantees.

40. **Notices.** Any payments to be made or any notices or other communications to be given pursuant to this Agreement shall be delivered to counsel for the appropriate Party as identified below.

41. **Termination**. If the Final Order has not been entered within 120 days of the date of this Agreement (or such later date as the Paties may agree in writing), any Party may terminate this Agreement upon written notice to the other Parties. Upon any termination of this Agreement pursuant to Section 3 or this Section, the Parties shall be restored to the positions they held immediately prior to the execution of this Agreement, all releases in Article 3 shall be void and of no effect, and the Parties' rights and defenses regarding the validity, priority, perfection, and avoidability of the Liens shall be fully preserved as if this Agreement had never been executed."

In witness whereof, the Parties hereto have executed this Agreement on the date set forth below.

[the remainder of this page has been intentionally left blank]

DATED: September 22, 2026

CHAPTER 7 TRUSTEE

______________________________
Jeffrey I. Golden
Chapter 7 Trustee

DATED: ______________ 2026

BRYAN GADOL

______________________________
Bryan Gadol

DATED: ______________ 2026

DARREN TESTA

______________________________
Darren Testa

DATED: ______________ 2026

GADOL FAMILY TRUST

______________________________
Bryan Gadol, as trustee of the
Gadol Family Trust

DATED: ______________ 2026

TESTA FAMILY TRUST

______________________________
Darren Testa, as trustee of the
Testa Family Trust

CHAPTER 7 TRUSTEE

DATED: ______________ 2026

______________________________
Jeffrey I. Golden
Chapter 7 Trustee

DATED: September 21, 2026

BRYAN GADOL

DocuSigned by:
Bryan Gadol
D2BB9D9E1429486...
______________________________
Bryan Gadol

DATED: ______________ 2026

DARREN TESTA

______________________________
Darren Testa

DATED: September 21, 2026

GADOL FAMILY TRUST

DocuSigned by:
Bryan Gadol
D2BB9D9E1429486...
______________________________
Bryan Gadol, as trustee of the
Gadol Family Trust

DATED: ______________ 2026

TESTA FAMILY TRUST

______________________________
Darren Testa, as trustee of the
Testa Family Trust

DATED: ____________ 2026

CHAPTER 7 TRUSTEE

______________________________
Jeffrey I. Golden
Chapter 7 Trustee

DATED: ____________ 2026

BRYAN GADOL

______________________________
Bryan Gadol

DATED: 9-21 2026

DARREN TESTA

______________________________
Darren Testa

DATED: ____________ 2026

GADOL FAMILY TRUST

______________________________
Bryan Gadol, as trustee of the
Gadol Family Trust

DATED: 9-21 2026

TESTA FAMILY TRUST

______________________________
Darren Testa, as trustee of the
Testa Family Trust

**SETTLEMENT AGREEMENT**

This settlement (the "**Agreement**") is entered into by, between, and among:

(i) Richard Marshack, in his capacity as the Chief Restructuring Officer ("**CRO**Jeffrey I. Golden, chapter 7 trustee ("**Trustee**") of the bankruptcy estate (the "**Estate**") of Simba IIIL Holdings, LLC ("**Debtor**" or "**Simba**"), Case No. 8:25-bk-12616-MH (the "**Bankruptcy Case**"), pending in the Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"); and

Formatted: Left

(ii) Messrs. Bryan Gadol, in his individual capacity and as trustee for the Gadol Family Trust ("**Gadol**"), and Darren Testa, in his individual capacity and as trustee for the Testa Family Trust ("**Testa**" and, collectively with Gadol, the "**Creditors**").

The persons and entities defined in paragraphs (i) through (ii) above are periodically referred to in this Agreement as a "**Party**" and collectively as the "**Parties**."

In consideration for the execution of this Agreement, and the performance of the terms and conditions herein, the Parties agree as follows:

**RECITALS**

A. On September 16, 2025, (the "**Petition Date**"), the Debtor commenced the Bankruptcy Case by filing a voluntary chapter 11 petition under title 11 of the United States Code in the Court.

B. On May 27, 2026, the Court entered an order converting the Bankruptcy Case to chapter 7.

Formatted: List Paragraph

Formatted: Indent: Left: 0", First line: 0.5", Line spacing: single

A.C. On Bankruptcy Court.June 2, 2026, the Trustee accepted his appointment as chapter 7 trustee. The Trustee continues to act in his capacity as chapter 7 trustee of Debtor's bankruptcy estate ("**Estate**").

B.D. On December 18, 2025, Gadol filed a claim (the "**Gadol Claim**") in the Bankruptcy Case asserting a secured claim in the amount of $11,256,049.63 secured by all of the Debtor's assets. The Gadol Claim was assigned Claim No. 17-1.

C.E. On December 18, 2025, Testa filed a claim (the "**Testa Claim**" and, along with the Gadol Claim, the "**Claims**"")") in the Bankruptcy Case asserting a secured claim in the amount of $8,146,481.53 secured by all of the Debtor's assets. The Testa Claim was assigned Claim No. 18-1.

D.F. The Claims arise out of the Debtor's alleged breach of its guarantee of obligations allegedly owed to Creditors by Lugano Diamonds & Jewelry Inc. ("**Lugano**"), Lugano's former CEO Mordechai Ferder ("**Moti**"), and the Haim Family Trust (the "**Haim Trust**"), under profit-

sharing agreements for the purchase of Lugano's diamond inventory, to be converted into custom jewelry, and resold.

~~E.~~G. Prior to the Petition Date, Creditors have brought the following suits, collectively referred to as the "**Existing Actions**," against Simba, among others:

i. *Gadol, et al. v. Ferder, et al.* (Orange County Superior Court Case No. 30-2025-01488102-CU-BC-CJC) filed on June 6, 2025 (the "**California Action**");

ii. *Gadol, et al. v. Ferder, et al.* (Pitkin County Superior Court Case No. 2025CV30067) filed on June 18, 2025 (the "**Colorado Action**"); and

iii. *Gadol, et al. v. Simba IL Holdings, LLC* (domestication of California judgment, Delaware Superior Court Case No. N25J-01759) filed on July 2, 2025; and

iv. *Gadol, et al. v. Simba IL Holdings, LLC* (Delaware Superior Court Case No. N25C-07-026 PAW) commenced on July 2, 2025 (the "**Delaware Action**").

~~F.~~H. The Creditors have applied for and obtained the following attachment orders, (collectively referred to as the "**Liens**") via the Existing Actions against Simba, the Haim Trust, Moti, and their property:

i. Ex Parte Right to Attach Order and Order for Issuance of Writ of Attachment (Resident) dated June 12, 2025, as to Simba, among others, filed in the California Action;

ii. Writ of Attachment dated June 20, 2025 as to Moti, in his individual capacity and as trustee of the Haim Trust, filed in the California Action;

iii. Order: Proposed Order re Plaintiffs' Immediate Disposition and Ex Parte Motion for Prejudgment Writ of Attachment dated June 23, 2025, by which the Colorado Court issued a prejudgment writ of attachment pursuant to Colorado Rules of Civil Procedure ("**CRCP**") § 102 as to Moti, in his individual capacity and as trustee of the Haim Family Trust, and Simba filed in the Colorado Action (the "**Aspen Writ of Attachment**"), in the aggregate amount of $14,630,634.60, as to real property owned by the Haim Trust and located at 1220 Red Butte Drive, Aspen, Colorado, Pitkin County Parcel 273501316004/R008449 (the "**Aspen Property**")

iv. Recording of the Aspen Writ of Attachment on June 23, 2025. Creditors recorded the pre-judgment writ of attachment in Pitkin County on or about June 23, 2025 against the Aspen Property, at Reception No. 710102 (the "**Aspen Lien**");

**Formatted:** German (Germany)

**Formatted:** German (Germany)

v. Writ of Attachment dated July 1, 2025 as to Moti, in his individual capacity and as trustee of the Haim Trust, and Simba filed in the California Action;

vi. Delaware Domestication of California Writ, domesticated on July 2, 2025; and

vii. Order Granting Plaintiff's Ex Parte Motion for Mesne Writ of Attachment dated August 18, 2025 as to Simba, granted in the Delaware Action.

G.I. On September 16, 2025, and before Simba filed its Bankruptcy Petition, default judgment (the "**Delaware Judgment**") was entered in the Delaware Action against Simba and in favor of Gadol and Testa in the amounts of $7,929,072.00 and $6,377,794.84, respectively, with a judgment effective date of August 27, 2025.

H.J. Simba contends that it has valid defenses and counterclaims to the Creditors' claims as alleged in the Existing Actions. The Trustee continues to analyze Simba's counterclaims.

Formatted: List Paragraph

I. On or about September 5, 2025, Moti and his wife Edit Ferder, as trustees of the Haim Trust, executed a Special Warranty Deed to transfer the Aspen Property to Simba.

i. Simba asserts that it is the record owner of the Aspen Property.

ii. Creditors contend that, by virtue of the Aspen Writ of Attachment, the Claims are secured by the Aspen Property, notwithstanding its transfer to Simba.

Formatted: Justified, Space After: 0 pt

J.K. Simba is the owner of financial and investment accounts, including accounts previously managed by Beacon Pointe Advisors, as more particularly set forth in the schedule listed on the schedules filed in the Bankruptcy Case on September 30, 2025, Dkt No. 42, on Attachment A/B – 15.2, pdf page 11 (collectively, and together with any other financial and investment accounts owned by Simba but not yet scheduled, the "**Alternative Investments**").

K.L. Creditors contend that, as a result of the Liens, they have a perfected, unavoidable security interest in all of Simba's assets (all such assets, collectively, the "**Collateral**"), including, but not limited to, the following: the Aspen Property, the Alternative Investments, and Simba's stock and ownership interest in Lugano Holding, Inc. ("**Lugano Stock**"). All of the Collateral other than the Aspen Property is hereafter referred to as the "**Non-Aspen Collateral**."the Alternative Investments.

i. Aside from the Liens of the Creditors, the Aspen Property is encumbered with the following: (a) Deed of Trust from The Haim Family Trust U/D/T February 24, 2009 to the Public Trustee of Pitkin County for the use of Citibank, N.A. ("**Citi**"), to secure $11,537,500.00, dated January 13, 2022, and recorded January 18, 2022 at Reception No. 684382 (the "**First Deed of Trust**"), and

(b) Deed of Trust from The Haim Family Trust, U/D/T February 24, 2009 to the Public Trustee of Pitkin County for the use of White Mountain Capital Inc., to secure $6,750,000.00, dated March 10 2025, and recorded March 11, 2025 at Reception No. 708201 (the "**Second Deed of Trust**" and, along with the First Deed of Trust, the "**Aspen Deeds of Trust**").

M. Other than asserted Liens of the Creditors, the Parties are unaware of any other liens against Alternative Investments or Lugano Stock.The Trustee disputes the validity of the Liens and contends that, to the extent they are valid, the Liens are avoidable as preferential transfers.

ii.A.

Formatted: Indent: Left: 0", First line: 0.5", Line spacing: single

L. On December 16, 2025, the Bankruptcy Court issued an order [Docket No. 194] in the Bankruptcy Case that (a) resolved a pending motion for relief from stay [Dkt 86] (the "**Stay Motion**") filed in the Bankruptcy Case by White Mountain Capital Inc. ("**WMCI**") and (b) provides that (i) if amounts owed to WMCI under the Subject Loan (as defined in the Stay Motion) have not been paid on or before May 5, 2026 (the "**Sale Period End Date**"), and the Aspen Property has not been sold on or before the Sale Period End Date, the automatic stay of 11 U.S.C. § 362 shall terminate, and WMCI shall be granted *in rem* relief from the automatic stay for a two (2) year period pursuant to 11 U.S.C. § 362(d)(4); and (ii) reserved the right of third parties (such as the Creditors) to object to the amount or validity of the Subject Loan.

M. On February 13, 2026, the Debtor filed its proposed Chapter 11 Plan of Liquidation [Docket No. 229] in the Bankruptcy Case (the "Plan"). The Plan provides for: (i) the establishment of a liquidating trust (the "Trust") as of the effective date of the Plan (the "Plan Effective Date") under the control of a liquidating trustee (the "Liquidating Trustee"); (ii) the transfer of all of the Debtor's remaining assets as of the Plan Effective Date to the Trust; and (iii) the liquidation of such assets to fund distributions under the Plan.

N. Simba disputes the validity of the Liens.

O. Creditors dispute the validity of the Subject Loan and the Second Deed of Trust.

P. The Parties dispute whether the Liens against the Non-Aspen Property are avoidable (including, but not limited to, whether Simba was insolvent at the time the Liens were granted).

Q.N. The Parties wish to resolve such disputes consensually by, among other things, agreeing to the allowance of the Claims in a reduced amount, and treating each of the Liens as valid, perfected, and unavoidable, but sharing the distribution of proceeds of the Non-Aspen CollateralAlternative Investments between the Creditors and the Estate on the terms described in this Agreement.

R.O. In consideration of the mutual covenants, terms, representations and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

**ARTICLE 1**
**COURT APPROVAL**

1. **Binding Effect and Entry of Final Order**. This Agreement will be effective and binding only upon the entry by the Bankruptcy Court of a final order (a "**Final Order**") granting a motion for compromise of controversy under Federal Rule of Bankruptcy Procedure 9019 that reflects the Parties' Agreement (the "**Motion**") which contains the language described in Section 56 below. The term "**Final Order**" means an order granting the Motion and from which no appeal has been taken, and the time for taking such appeal has expired under the Federal Rules of Appellate Procedure, or, if any appeal has been taken, then: (i) no timely notice of appeal was filed, or (ii) if a notice of appeal was timely filed, then no stay pending appeal has been issued or is otherwise in effect. The date the Final Order takes effect will be the effective date of this Agreement ("**Effective Date**").

2. **No Inconsistent Actions**. No Party shall take any action inconsistent with this Agreement pending the entry of the Final Order and the resolution of any appeal of the Final Order, or the termination of this Agreement.

**Formatted:** List Level 1, Justified, Indent: Left: 0.5"

3. **Trustee Termination of Agreement**. The Trustee may unilaterally terminate this Agreement at any time before the Effective Date if performance of the terms of this Agreement by the Trustee becomes impractical for any reason, or if facts arise that, in the Trustee's reasonable business judgment, materially and adversely affect the Estate's position with respect to the Liens or the Alternative Investments. If the Final Order is reversed, vacated, or modified on appeal such that it no longer contains the language required by Section 6, this Agreement shall automatically terminate and the Parties shall be restored to their respective positions as if this Agreement had not been executed, without prejudice to the Trustee's right to contest the validity, perfection, or priority of the Liens

**ARTICLE 2**
**TERMS OF THE AGREEMENT**

3.4. **Partial Allowance of Claims**. The Gadol Claim shall be reduced to, and allowed as, a claim in the amount of $7,929,0723,688,503.00 (the "**Allowed Gadol Secured Claim**"), which shall be treated as a secured claim to the extent of the share of the proceeds of the disposition of the CollateralAlternative Investments distributable to Gadol under this Agreement and, with respect to any deficiency, as a general unsecured claim. The Testa Claim shall be reduced to, and allowed as, a claim in the amount of $6,377,794.843,176,003.00 (the "**Allowed Testa Secured Claim**" and, collectively with the Allowed Gadol Secured Claim, the "**Allowed Secured Claims**") which shall be treated as a secured claim to the extent of the share of the proceeds of the disposition of the CollateralAlternative Investments distributable to Testa under this Agreement and, with respect to any deficiency, as a general unsecured claim.

4.5. **Validity and Perfection of Liens/Sharing of Proceeds** . The Debtor acknowledges that the Creditors' Lien against the Aspen Property is valid, perfected, enforceable, and unavoidable, as of June 23, 2025, and shall continue to secure the Allowed Secured Claims, subject only to the Aspen Deeds of Trust, as applicable. The Debtor furtherTrustee acknowledges that, as a compromise of the Parties' dispute as to whether the Liens against the Non-Aspen CollateralAlternative Investments are avoidable, those Liens shall be deemed valid, perfected, enforceable and unavoidable, as of July 10, 2025, but subject to an agreed sharing of their proceeds, whether via sale or otherwise, as described in the terms of Section 6 below., and only after the Court approves this Agreement, should it approve this Agreement at all.

5.6. **Mandatory language on Effect of Creditors' Liens**. The Final Order shall include the following language:

> "For purposes of this Chapter 117 case, any subsequent bankruptcy casethe Trustee, on behalf of the Debtor, and any proceeding in any forum, the Debtor and the Estate stipulate, stipulates and the Court hereby finds that (i) Bryan Gadol shall be allowed a secured claim (the "Allowed Gadol Secured Claim") in the amount of $7,929,0723,688,503.00; (ii) Darren Testa shall be allowed a secured claim (the "Allowed Testa Secured Claim" and, along with the Allowed Gadol Secured Claim, the "Allowed Secured Claims") in the amount of $6,377,794.843,176,003.00, and (iii) the Liens shall be deemed valid, perfected, enforceable, and unavoidable against the CollateralAlternative Investments as of no later than the Petition Date and shall continue to secure the Allowed Secured Claims, notwithstanding conversion, or dismissal, or of the commencement of any subsequent bankruptcy case involving the DebtorBankruptcy Case. Nothing in this paragraph shall be construed to create a new lien in violation of the Bankruptcy Code but rather constitutes recognition and approval of the liens existing as of the Petition Date. To the extent required, Creditors are hereby granted relief from the automatic stay to comply with their obligations under this Agreement including, but not limited to, dismissal of Simba from the Existing Actions in accordance with Section 11 of the Agreement."

The enforceability of this Settlement Agreement is contingent on the Bankruptcy Court's order containing the aforementioned language, or similar language that is agreed to by the Parties and is approved by the Creditors,, each acting in their solereasonable discretion.

6.7. **Proceeds of Asset Liquidation**. The Debtor, by and through its CRO or any other person approved by the Bankruptcy Court to act on the Debtor's behalf in this regard, will oversee and control the asset liquidation process described in this section and will distribute (or retain for the Estate) any dividends, income, sale proceeds, or other proceeds of the Collateral per the terms of this Agreement in accordance with the provisions of Title 11, United States Code (the "**Bankruptcy Code**"). Any portion of the proceeds of sale or other disposition of some or all of the CollateralAlternative Investments that is payable to the Creditors under the terms of this Agreement shall be paid to the Creditors as soon as reasonably possible following the entry of any Bankruptcyfinal Court orders authorizing the sale or disposition of such portion

of the Collateral.Alternative Investments. Any proceeds of the CollateralAlternative Investments applied to pay the Allowed Secured Claims shall be applied to pay the Allowed Gadol Claim and the Allowed Testa Claim pursuant to joint written instructions from Gadol and Testa (which may be provided via email and/or through their counsel of record identified in their proofs of claim filed in the Bankruptcy Case).

a. **Cooperation.** The Creditors and the Debtor, by and through its CRO, or any other person approved by the Bankruptcy Court to act on the Debtor's behalf in this regard,Trustee shall work together in good faith to monetize the Aspen Property and the Alternative Investments as soon as commercially practicable to maximize their value. Such good faith cooperation will include: the Parties executing all necessary documents to implement the liquidation including the release of Liens as necessary to allow for sales to proceed, supporting all necessary motions in the Bankruptcy Court to effectuate the same, and seeking any appropriate orders of the courts in the Existing Actions necessary to effectuate the dismissal of Simba from such Existing Actions.

i. **Reservation of rights to contest manner of liquidation.** The Creditors reserve the right to object to any sale of the CollateralAlternative Investments pursuant to 11 U.S.C. § 363, any proposed chapter 11 plan, or any other motion to sell, liquidate or dispose of any portion of the CollateralAlternative Investments to the extent the Creditors believe the requested relief violates this Agreement or otherwise fails to maximize the value of such CollateralAlternative Investments.

b. **Property Insurance and Costs for Preservation of the Aspen Property**.

i. In the event that Creditors receive notice of an upcoming deadline for payment of property insurance premium or other costs essential to preservation of the value of the Aspen Property (each such amount an "**Aspen Property Maintenance Amount**"), the Creditors may, in their sole discretion, and subject to first providing at least twenty-four (24) hours' notice of such deadline to the Estate and of Creditors' intent to pay such Aspen Property Maintenance Amount, pay such Aspen Property Maintenance Amount in order to preserve the value of the Aspen Property. The total of all Aspen Property Maintenance Amounts funded by Creditors pursuant to this provision, less any portion of such Aspen Property Maintenance Amounts already reimbursed to Creditors by the Estate, shall constitute the "**Outstanding Aspen Property Maintenance Amount**." The amount(s) of the Allowed Gadol Claim and/or the Allowed Testa Claim shall be increased dollar-for-dollar by the aggregate amount of all Aspen Property Maintenance Amounts paid by Gadol and/or Testa, respectively.

ii. In addition to the payments set forth in the Debtor's Application for Order Authorizing Employment of Steven Shane of Compass Colorado, LLC (the "**Real Estate Broker**") as the Debtor's Real Estate Broker [Docket No. 34] which was approved by the Bankruptcy Court on November 14, 2025 [Docket No. 131], Creditors agree that the Real Estate Broker shall, in addition to other monies due to Real Estate Broker in the event a sale of the Aspen Property closes, be reimbursed from the proceeds of the sale of the Aspen Property for any reasonable expenses advanced to maintain the Aspen Property as long as that sum does not exceed $30,000 without additional consent.

c. **Disposition of Proceeds from Sale of Aspen Property**. The Parties and the CRO, or any other person approved by the Bankruptcy Court to act on the Debtor's behalf in this regard, shall work together in good faith to sell the Aspen Property pursuant to 11 U.S.C. § 363 or a confirmed chapter 11 plan (any such sale, a "**Bankruptcy Court Approved Sale**"). The proceeds from any Bankruptcy Court Approved Sale of the Aspen Property shall be used, *first,* to pay amounts owed to Citi and secured by the First Deed of Trust; *second*, to pay the undisputed, unobjected amounts owed to WMCI under the Subject Loan and secured by the Second Deed of Trust provided that, to the extent that Creditors, or a third party (other than the Debtor) has commenced an adversary proceeding challenging the validity of the Subject Loan or the Second Deed of Trust, any disputed amounts otherwise distributable to WMCI shall be placed in escrow pending an order of the Bankruptcy Court determining the disposition of such disputed amounts; and, *third*, to pay the commercially reasonable costs of sale (inclusive of all fees required to be paid to the United States Trustee on account of disbursements made attributable to the proceeds from the sale ("**Closing Costs**"). After payment, or placement into escrow, of the amounts described above, the net proceeds, if any, will then be paid as follows without any further Court Order necessary: to the CRO, in the amount of $250,000 (the "**Administrative Expense Carveout Amount**") to be allocated as the maximum carve out from the sale of the Aspen Property to fund administrative expenses for the Estate; with any remaining balance payable to the Creditors on account of the Allowed Secured Claims (the "**Aspen Property Proceeds Distribution**").

i. **Reservation of Rights to Object to the Second Deed of Trust**. The Creditors expressly reserve the right to object to the Second Deed of Trust, the Subject Loan, and claims underlying the same.

ii. **Disposition of Aspen Property Outside of Bankruptcy**. In the event that relief from the automatic stay is granted to one of the holders of the Aspen Deeds of Trust, and the Aspen Property is either: 1) sold outside of the Bankruptcy Case or 2) foreclosed upon, then the Administrative Expense Carveout Amount shall be applied to pay the Allowed Secured Claims rather than paid to the CRO.

b. **Assignment of Claims Against Haim Trust**. The Creditors hereby assign all claims the Creditors hold against Haim Trust, its trustee or trustees, its beneficiaries, and any res of the trust, to the Estate ("Assigned Claims"). Any proceeds from the Assigned Claims shall be split, after payment of all professional fees, expenses and other costs associated with the Trustee's pursuit of the Assigned Claims, as follows: (i) fifty percent (50%) to the Estate (or any successor in interest appointed in the Bankruptcy Case) to be administered in accordance with the Bankruptcy Code; and (ii) fifty percent (50%) to the Creditors on account of their Allowed Secured Claims, after receipt of funds generated from the Assigned Claims and Court approval of any settlement, if applicable.

d.c. **Disposition of Proceeds from Alternative Investments.** The Parties agree to the following terms for monitoring and disposition of the Alternative Investments:

i. **Court Approval Required for Sale, Liquidation or Early Termination of the Alternative Investments Prior to Confirmation.**. No Alternative Investment shall be sold, liquidated, or terminated prior to its maturity date, without approval of

the Bankruptcy Court after motion and notice to Creditors, the United States Trustee, and all parties requesting special notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

ii. **Post-Confirmation Sale, Liquidation or Early Termination of the Alternative Investments.** In the event that the Plan is confirmed, no Alternative Investment may be sold, liquidated, or terminated prior to its maturity date and after the Plan Effective Date without one of: (i) consent of the Creditors; or (ii) approval of the Bankruptcy Court.

iii.ii. **Cooperation as to Monitoring Alternative Investments.** The Parties understand and acknowledge that third parties (including, but not limited to, Moti, the Haim Trust, and Beacon Pointe) may possess information regarding the Alternative Investments. The Parties agree to cooperate with each other to obtain documents and information from the investment funds for the Alternative Investments and third parties (to the extent any of them possess such information), regarding the: (1) current value of partnershipinvestment fund interest; (2) schedule of capital contributions, distributions since inception; (3) schedule of unfunded capital commitments, approximate due dates, and any unfunded capital calls to date, including current penalties or interest; (4) impact on investment value if required capital commitments are not made; (5) remaining term of investment fund and estimated distribution schedule; and (6) copies of investment agreements. Upon their receipt, each Party shall promptly share with the other Parties all periodic reports, or other information, relevant to monitoring the value of the Alternative Investments, any capital calls, defaults, penalties or interest due on, or related to, the Alternative Investments.

iv.iii. **Capital Calls and Preservation of the Alternative Investments**. In the event that Creditors, or the Trustee, receive notice of an upcoming deadline for Simba to pay a capital call amount, or pay an amount necessary to avoid or cure a default, or avoid the assessment of a penalty, in connection with the Alternative Investments (each such amount a "**Capital Call Amount**"), such Party shall promptly provide notice thereof to the other Party. In addition, the Trustee may request in writing (including, but not limited to, by email) that Creditors may, in their sole discretion, and subject to first providing at least twenty-four (24) hours' notice of such deadline to the Estate and of Creditors' intent to pay such Capital Call Amount, pay such Capital Call Amount in order to preserve the value of the Alternative Investments. In response to such request from the Trustee, Creditors may, but shall have no obligation to, pay any such Capital Call Amount. The total of all Capital Call Amounts funded by Creditors pursuant to this provision, less any portion of such Capital Call Amounts already reimbursed to Creditors by the Estate, shall constitute the "**Outstanding Capital Call Amount**." The amount(s) of the Allowed Gadol Claim and/or the Allowed Testa Claim shall be increased dollar-for-dollar by the aggregate amount of all Capital Call Amounts paid by Gadol and/or Testa, respectively. The Trustee shall have the right, but not the obligation, to fund any Capital Call Amount using unencumbered Estate funds in lieu of the Creditors, in which case no increase to the Allowed Secured Claims shall result, subject to Court approval.

v.iv. **Pre-Sale Proceeds**. Any dividends, income, or other non-sale proceeds (collectively, "**Alternative Investment Non-Sale Proceeds**") of the Alternative Investments (whether received by the Estate prior to, or after, the Effective Date) shall be split as follows: *first*, to reimburse the Creditors for any Outstanding Capital Call Amount; and, *second*,

~~to reimburse the Creditors for any Outstanding Aspen Property Maintenance Amount; and, *third*,~~ after the Outstanding Capital Call Amount ~~and the Outstanding Aspen Property Maintenance Amount have each~~has been repaid in full to Creditors, the balance of the Alternative Investment Non-Sale Proceeds to be split (i)~~ ~~ seventy-five percent (75%) to the Estate (or any successor in interest appointed in the Bankruptcy Case) to be administered in accordance with the Bankruptcy Code; and (ii)~~ ~~ twenty-five percent (25%)~~ percent~~ to the Creditors on account of their Allowed Secured Claims, in each case as soon as practicable after receipt of such Alternative Investment Non-Sale Proceeds by the Estate (or any successor in interest appointed in the Bankruptcy Case).

~~vi.~~v. **Proceeds of Sale of Alternative Investments.** In the event of a sale of any portion of the Alternative Investments, the proceeds from the sale shall be used, *first*, to pay the Closing Costs ~~of such~~ (i.e., reasonable brokerage fees, transfer taxes, and other customary costs of sale~~;~~); and *second*, to reimburse the Creditors for any Outstanding Capital Call Amount~~; and, *third*, to reimburse the Creditors for any Outstanding Aspen Property Maintenance Amount.~~ . After paying such amounts, the net proceeds of such sale shall then be split (i) seventy-five percent (75%) to the Estate (or any successor in interest appointed in the Bankruptcy Case) to be administered in accordance with the Bankruptcy Code; and (ii) twenty-five ~~(25%)~~ percent (25%) to the Creditors on account of the Allowed Secured Claims, in each case to be distributed to Creditors as soon as practicable after a Final Order of the ~~Bankruptcy~~ Court approving such sale.

Formatted: Font: Bold, Underline

~~e.~~d. **Disposition of ~~Lugano Stock or~~ Other Collateral.** The Allowed Secured Claims also remain secured by ~~(i) the Lugano Stock and (ii) any remaining Simba~~additional assets (excluding the Aspen Property, and Alternative Investments~~ and Lugano Stock~~, the "**Additional Collateral**"). If ~~the Lugano Stock or the~~ any Additional Collateral ~~generate~~generates any proceeds (whether by dividend, income, sale, or otherwise, and regardless of whether such proceeds are received by the Estate prior to, or after, the Effective Date) (any such proceeds referred to herein as "**Other Collateral Proceeds**"), and should such Other Collateral Proceeds become available to the Estate after satisfaction of any senior liens on those Other Collateral Proceeds (if any such senior liens exist), then such Other Collateral Proceeds shall be used, *first*, to pay ~~the Closing Costs~~any closing costs of any sale thereof; and *second*, to reimburse the Creditors for any ~~Outstanding~~ Capital Call Amount~~; and, *third*, to reimburse the Creditors for any Outstanding Aspen Property Maintenance Amount~~. After paying such amounts, the net Other Collateral Proceeds shall then be split as follows: (x) seventy-five percent (75%) to the Estate (or any successor in interest appointed in the Bankruptcy Case) to be administered in accordance with the Bankruptcy Code; and (y) twenty-five ~~(25%)~~ percent (25%) to the Creditors on account of the Allowed Secured Claims, as soon as practicable after receipt by the Estate (or any successor in interest appointed in the Bankruptcy Case).

e. **Mandatory Language on Section 363(k) Right to Credit Bid.** The Final Order shall include the following language:

> "In the event of a sale of any portion of the Alternative Investments or the Additional Collateral, each of the Creditors shall have the right, pursuant to Section 363(k) of the Bankruptcy Code, to bid at such sale, and, if such Creditor's bid is selected as the winning bid, such Creditor may offset his

Allowed Secured Claim to pay twenty-five percent (25%) of the purchase price."

7.8. **Allowed Deficiency Unsecured Claim.** To the extent that the disposition of the CollateralAlternative Investments is insufficient to pay the Allowed Gadol Claim and the Allowed Testa Claim in full, each of Gadol and Testa shall have an allowed general unsecured, non-subordinated claim, in the amount of any deficiency remaining on their respective Allowed Secured Claims after liquidation of the Collateral. Alternative Investments. The Trustee's payment of the Allowed Secured Claims in accordance with this Section 8 and the Final Order shall be deemed made pursuant to, and protected by, the Final Order, and the Trustee shall have no liability to any party for distributions made in good-faith reliance on the terms of this Agreement and the Final Order.

8.9. **Payment of Settlement Amount as funds become available**. The CROTrustee shall expeditiously pay the Creditors' respective Allowed Secured Claims without further Bankruptcy Court Order, as funds frombecome available and only after entry of a Final Order by the Court authorizing the distribution of cash or other property to the Creditors, upon the liquidation, or other proceeds, of the Collateral become availableAlternative Investments, until the Allowed Secured Claims are each paid in full. All amounts payable to the Creditors on account of their Allowed Secured Claims (including any portion of the Allowed Secured Claims that is unsecured) shall be paid according to written instructions provided by the Creditors to the Debtor's counsel, or to counsel for any trustee or successor in interest to the Debtor's Estate appointed in the Bankruptcy CaseTrustee's counsel.

9.10. **Prohibition on Priming Liens**. The DebtorUpon an order of the Court approving this Agreement, should it be approved at all, the Trustee acknowledges and agrees that the Creditors' liens, security interests, and rights in and to the CollateralAlternative Investments are valid, perfected, and enforceable, and are not subject to avoidance, subordination, or priming under any provision of the Bankruptcy Code or other applicable law, including, without limitation, sections 364(d), 510, 544, 547, 548, or 549 of the Bankruptcy Code. The DebtorTrustee agrees not to seek, support, or consent to any order or relief that would grant a lien senior to, or *pari passu* with, the liens of the Creditors in the Collateral, without the Creditors' prior written consent. specifically in the Alternative Investments, without the Creditors' prior written consent; provided, however, that nothing in this Section shall restrict the Trustee's ability to seek Court approval of general estate financing, administrative-expense priority, or surcharge relief under 11 U.S.C. § 506(c) that does not encumber or prime the Creditors' liens on the Alternative Investments.

~~10. **Deadline to Obtain Court Approval**. In the event a Final Order is not entered on or before March 31, 2026, the Creditors may, in their sole discretion, terminate this Agreement by written notice provided to Debtor on or before April 7, 2026.~~

11. **Dismissal of All Existing Actions**. Within ten business days of the later of the Effective Date or the date of the Aspen Property Proceeds Distribution, the Creditors shall file forms, as appropriate per jurisdiction, dismissing Simba from each of the Existing Actions with prejudice ("**Dismissal Requests**"). For the avoidance of doubt, nothing in this Agreement shall require that the Existing Actions be dismissed as to any defendants other than Simba.

**Formatted:** Default Paragraph Font, Font:

**ARTICLE 3**
**RELEASE OF CLAIMS**

12. **Definition of Released Claims.** "**Released Claims**" will mean any and all claims, allegations, assertions, demands, rights, duties, obligations, contracts, agreements, covenants, promises, understandings, debts, demands, encumbrances, liens, damages, injuries, losses, actions, causes of action, costs, expenses, charges, attorneys' fees, judgments, orders, levies, and liabilities of any kind, whether in law or equity, known or unknown, and concealed or revealed.

13. **Effective ~~Release~~ Date~~.~~ for Releases.** The releases set forth in this Article 3 shall not be effective unless and until the ~~later to occur of: 1) the~~ Effective Date~~; or 2) the date of the Aspen Property Proceeds Distribution (the "**Release Date**").~~. The releases shall automatically and irrevocably become effective as of that date.

~~14.~~ **Release of Simba**. Except for the obligations arising under this Agreement, and subject to the limitations of Section 16 of this Agreement, on the ~~Release~~Effective Date, the Creditors, their family members, including Felicia Testa, their related trusts, including the Gadol Family Trust and the Testa Family Trust, do hereby release, cancel, and forever discharge the Debtor, the Trustee and the Estate (and, for the avoidance of doubt, the ~~CRO~~Debtor's and Trustee's professionals, agents and employees) from any and all Released Claims, causes of action, actions, judgments, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, arising out of or related in any way to any of the claims asserted in the Existing Actions or any other matter or claim arising out of the relationship between or among the Creditors, on the one hand, and the Debtor ~~on the other, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the Effective Date.~~

~~15.~~14. ~~**Release of Creditors**. Except for the obligations arising under this Agreement, and subject to the limitations of Section 16 of this Agreement, on the Release Date, the Debtor and the Estate (and, for the avoidance of doubt, the CRO) do hereby release, cancel, and forever discharge each of the Creditors and their family members, including Felicia Testa, their related trusts, including the Gadol Family Trust and the Testa Family Trust, from any and all Claims, causes of action, actions, judgments, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, arising out of or related in any way to any of the claims asserted in the Existing Actions or any other matter or claim arising out of the relationship between or among the Creditors, on the one hand, and the Debtor~~and Trustee on the other, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the Effective Date.

15. **Release of Creditors**. Except for the obligations arising under this Agreement, and subject to the limitations of Section 16 of this Agreement, on the Effective Date, the Trustee, on behalf of the Estate, does hereby release, cancel, and forever discharge each of the Creditors their family members, including Felicia Testa, their related trusts, including the Gadol Family Trust and the Testa Family Trust, and the Creditors' professionals, agents and employees, from any and all Released Claims, causes of action, actions, judgments, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and

character, arising out of or related in any way to any of the claims asserted in the Existing Actions, or any other matter or claim arising out of the relationship between or among the Creditors, on the one hand, and the Debtor, the Trustee, and the Estate, on the other hand, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the Effective Date.

16. **Specific Exclusion of Release**. For the avoidance of any doubt, nothing in this Agreement releases any Released Claims causes of action, actions, judgments, trust deeds, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, against any of the following entities, their directors, officers, employees, subsidiaries, affiliates, agents, attorneys, trustees, immediate family members, and representatives: Lugano Diamonds & Jewelry, Inc., Lugano Buyer, Inc., K.L.D Jewelry, LLC, Lugano Prive, LLC, Lugano Holdings, Inc., Moti, Edit Ferder, the Haim Trust, Joshua Gaynor, Compass Group Diversified Holdings, LLC (NYSE: CODI), Beacon Pointe Financial, Luxe Maison Properties, Inc. d/b/a The Daftarian Group, Serenade Newport, LLC., Paul Daftarian, Lili Daftarian, Michael Gerro, Sahand Zargari, Jacob Wolf, White Mountain Capital Inc., and any party not specifically released herein. To the extent there is any ambiguity or inconsistency with any other provision of the Agreement, this provision controls.

17. **Release of Released Claims and California Civil Code Section 1542 Waiver.** Except for the obligations arising under this Agreement, as of the ~~Release~~Effective Date, the Creditors, and their family members, including Felicia Testa, their related trusts, including the Gadol Family Trust and the Testa Family Trust, on the one hand, and the Debtor, the Trustee and ~~the~~ Estate ~~(and, for the avoidance of doubt, the CRO),~~, on the other hand, hereby forever mutually and generally release and discharge one another and each of their respective officers, directors, trustees, agents, employees, consultants, affiliates, divisions, subsidiaries, predecessors, successors, assigns, partners, shareholders, administrators, executors, principals, attorneys, insurers, and representatives from any and all Released Claims, causes of action, actions, judgments, trust deeds, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, arising ~~in connection with any matter whatsoever~~out of or related in any way to the Existing Actions, the Released Claims, the Liens, or the Alternative Investments, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the ~~Release~~Effective Date.

Except for the obligations arising under this Agreement the Parties expressly waive and relinquish any and all rights and benefits of section 1542 of the California Civil Code ("**Section 1542**"), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Notwithstanding the provisions of Section 1542, the Parties expressly acknowledge this Agreement is intended to release Released Claims they do not know or suspect to exist in their favor at the time of the execution of this Agreement. The Parties further acknowledge that they

later may discover facts different from or in addition to those they now know or believe to be true regarding the matters released or described in this Agreement, and even so they agree that the releases and agreements contained in this Agreement shall remain effective in all respects notwithstanding any later discovery of any different or additional facts. The Parties expressly assume any and all risk of any mistake in connection with the true facts involved in the matters, disputes, or controversies released or described in this Agreement or with regard to any facts now unknown to them relating thereto. The Parties warrant that they have read this Agreement, including this waiver of Section 1542, and that they have consulted with or had the opportunity to consult with counsel of their choosing about this Agreement and specifically about the waiver of Section 1542, and that they understand this Agreement and the Section 1542 waiver, and so the Parties freely and knowingly enter into this Agreement.

18. **Binding Effect.** To the fullest extent permitted by law, the terms of this Agreement, including all benefits derived by any Party pursuant to the terms of this Agreement, shall be binding on all of the Parties and their heirs, successors, assigns, administrators, conservators, and executors.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES**

19. **Legal Capacity to Contract.** Each Party represents that it has the requisite power, authority, and legal capacity to make, execute, enter into, and deliver this Agreement and to fully perform its duties and obligations under this Agreement, and that neither this Agreement nor the performance by such Party of any duty or obligation under this Agreement will violate any other contract, agreement, covenant, or restriction by which such Party is bound. For the avoidance of doubt, ~~Richard A. Marshack, CRO,~~the Trustee is signing this Agreement solely in his capacity as the ~~Chief Restructuring Officer~~chapter 7 trustee and not in his individual capacity nor as a member, partner or shareholder of ~~the Debtor.~~any non-debtor entity. Nothing contained in this Agreement shall in any way impute liability to ~~Richard A. Marshack~~the Trustee personally, or as a member of any professional organization, including ~~Marshack Hays Wood~~Golden Goodrich LLP, or anyone acting on his or their behalf. The Trustee, his professionals, agents, and any successor trustee or estate representative shall have no personal liability to any Party or third party for any act or omission taken in good faith in connection with the negotiation, execution, approval, or performance of this Agreement, except for gross negligence or willful misconduct as determined by a final, non-appealable order of a court of competent jurisdiction.

20. **No Prior Assignments.** Each Party represents that it has not pledged, transferred, or assigned to any third party any right, interest, claim, or cause of action being transferred, conveyed, released, or compromised pursuant to this Agreement.

21. **No Undisclosed Inducements.** Each Party represents that it entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances, and that no representations, warranties, or promises other than those set forth in this Agreement were made by any Party or any employee, agent, or legal counsel of any Party to induce such Party to execute this Agreement.

22. **No Admission of Liability.** This Agreement was negotiated and executed for the purpose of settling the disputes described in the Agreement and effectuating the releases of Released Claims described in this Agreement. The execution of this Agreement by any Party does not constitute, infer, or evidence the truth of any claim, the admission of any liability, the validity of any defense, or the existence of any circumstance or fact which could constitute a basis for any claim, liability, or defense, other than for the purpose of enforcing the terms and provisions of this Agreement.

23. **Representation by Counsel.** Each Party represents that it has acted pursuant to the advice of legal counsel of its own choosing in connection with the negotiation, preparation, and execution of this Agreement, or was advised by the other to obtain the advice of legal counsel and had ample opportunity to obtain the advice of legal counsel or has knowingly and voluntarily agreed to proceed without legal counsel.

24. **Truth and Accuracy of Representations and Warranties.** Each of the representations, warranties, and covenants set forth in this Agreement shall be, and the Party making the same shall cause them to be, true and correct as of the time of execution of this Agreement and as of the time of the entry by the ~~Bankruptcy~~ Court of the Final Order.

25. **Survival.** Each of the statements, certifications, representations, warranties, covenants, disclosures, disclaimers, waivers, and other agreements contained in this Agreement shall survive the execution of this Agreement, the payment of any settlement consideration provided for in this Agreement, and the dismissal of any legal actions referenced in this Agreement.

## ARTICLE 5
## GENERAL TERMS AND PROVISIONS

26. **No Limitation on Third Parties**. This Agreement does not preclude or limit in any way any of the Parties' rights to pursue third parties, including but not limited to: Lugano Diamonds & Jewelry, Inc., Lugano Buyer, Inc., K.L.D Jewelry, LLC, Lugano Prive, LLC, Lugano Holdings, Inc., Moti, Edit Ferder, the Haim Trust, Joshua Gaynor, Compass Group Diversified Holdings, LLC (NYSE: CODI), Beacon Pointe Financial, Luxe Maison Properties, Inc. d/b/a The Daftarian Group, Serenade Newport, LLC., Paul Daftarian, Lili Daftarian, Michael Gerro, Sahand Zargari, Jacob Wolf, White Mountain Capital Inc., and their respective officers, directors, trustees, agents, employees, consultants, affiliates, divisions, subsidiaries, predecessors, successors, assigns, partners, shareholders, administrators, executors, principals, attorneys, insurers, and representatives from any and all Released Claims, causes of action, actions, judgments, trust deeds, promissory notes, liens, indebtedness, damages, losses, claims for relief, liabilities and demands of every kind and character, arising in connection with any matter whatsoever, whether known or unknown, suspected or unsuspected, existing or prospective, which have accrued from the beginning of time to the Effective Date.

27. **Entire Agreement.** This Agreement shall constitute the sole and entire agreement between the Parties with respect to the settlement of disputes and release of claims provided for in the Agreement. Any and all prior or contemporaneous agreements and negotiations, whether oral

or written, with respect to the subject matter of this Agreement, are hereby superseded. No employee or agent of any Party has authority to orally modify any term or condition of this Agreement, or to make any representation or agreement other than as contained in this Agreement. Unless any representation or agreement is contained in this Agreement or is added pursuant to a written amendment executed by all Parties, it shall not be binding nor otherwise affect the validity of this Agreement.

28. **Amendment of Agreement.** No modification of, deletion from, or addition to this Agreement shall be effective unless made in writing and executed by each Party to this Agreement.

29. **Construction of Agreement.** The provisions of this Agreement shall be liberally construed to effectuate the intended settlement and the release of all related claims. Section headings have been inserted for convenience only and shall not be given undue consideration in resolving questions of construction or interpretation. For purposes of determining the meaning of, or resolving any ambiguity with respect to, any word, phrase, term, or provision of this Agreement, each Party shall be deemed to have had equal bargaining strength in the negotiation of this Agreement and equal control over the preparation of this document, such that neither the Agreement nor any uncertainty or ambiguity in the Agreement shall be arbitrarily construed or resolved against any Party under any rule of construction.

30. **Further Assurances.** Each Party shall promptly execute any and all instruments and documents and take all other actions that may be required to effectuate the Agreement.

31. **Gender and Quantitative Use.** Wherever the context of this Agreement may so require, the gender shall include the masculine, feminine, and neuter, and the quantitative usage of any word, term, or phrase shall include the singular and plural.

32. **Enforcement of Agreement.** Each Party to this Agreement shall have the right to enforce by proceedings at law or in equity all of the terms and provisions of this Agreement, including, without limitation, the right to prosecute proceedings at law or in equity against the person(s) who have violated or who are attempting to violate any of such terms or provisions, to enjoin such person(s) from doing so, to cause such violation to be remedied, and/or to recover damages for such violation.

33. **Waiver.** The failure by any Party to enforce any term or provision of this Agreement shall not constitute a waiver of the right to enforce the same term or provision, or any other term or provision of the Agreement. No waiver by any Party of any term or provision of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

34. **Severability.** In the event that any term or provision of this Agreement is held by any court of competent jurisdiction to be illegal, invalid, or unenforceable for any reason, then the remaining portions of this Agreement shall nonetheless remain in full force and effect, unless such portion of the Agreement is so material that its deletion would violate the obvious purpose and intent of the Parties.

35. **Litigation Costs and Attorneys' Fees.** If any Party(s) shall commence legal proceedings against any other Party(s) to enforce the provisions of this Agreement or to declare any rights or obligations under this Agreement, then the prevailing Party(s) shall recover from the losing Party(s) its/their costs of suit, including reasonable attorneys' fees, as shall be determined by the court. Otherwise, each Party to this Agreement shall bear his, her or its own attorneys' fees and costs incurred in connection with the claims described, assigned, transferred, prosecuted or defended herein, as well as in connection with the negotiation, execution and approval of this Agreement.

36.35. **Tax Matters**. Each party shall be solely responsible for any and all taxes consequences and/or taxes that may be owed to any federal, state, or local taxing authority as a result of the settlement payment received under this Agreement and the agreement set forth herein.

37.36. **Governing Law.** This Agreement is made under and shall be construed in accordance with and governed under the Bankruptcy Code, and, if applicable, by the laws of the State of California. All Parties consent to the jurisdiction of the United States Bankruptcy Court, Central District of California, Santa Ana Division, for the purpose of resolving any disputes which may arise under or relate to this Agreement.

38.37. **Retention of Jurisdiction.** The Bankruptcy Court shall retain jurisdiction to hear any actions relating to this Agreement, including any resolution for any dispute arising from the terms of this Agreement.

39.38. **Counterparts.** This Agreement may be executed in any number of identical counterparts, each of which is an original, and all of which together constitute one and the same agreement. A facsimile or electronic image of a signature shall have the same force and effect as on original signature.

40.39. **Inurement.** This Agreement shall inure to the benefit of and be fully binding upon each of the Parties and upon their respective heirs, executors, successors, assigns, and grantees.

41.40. **Notices.** Any payments to be made or any notices or other communications to be given pursuant to this Agreement shall be delivered to counsel for the appropriate Party as identified below.

41. **Termination**. If the Final Order has not been entered within 120 days of the date of this Agreement (or such later date as the Paties may agree in writing), any Party may terminate this Agreement upon written notice to the other Parties. Upon any termination of this Agreement pursuant to Section 3 or this Section, the Parties shall be restored to the positions they held immediately prior to the execution of this Agreement, all releases in Article 3 shall be void and of no effect, and the Parties' rights and defenses regarding the validity, priority, perfection, and avoidability of the Liens shall be fully preserved as if this Agreement had never been executed."

In witness whereof, the Parties hereto have executed this Agreement on the date set forth below.

[the remainder of this page has been intentionally left blank]

Formatted Table

| | |
|---|---|
| DATED: _____________ 2026 | CHAPTER 7 TRUSTEE<br>~~RICHARD MARSHACK~~<br>______________________________<br>~~Richard Marshack, Chief Restructuring Officer of Simba IL Holdings, LLC~~<br>______________________________<br>Jeffrey I. Golden<br>Chapter 7 Trustee |
| DATED: _____________ 2026 | BRYAN GADOL<br>______________________________<br>Bryan Gadol |
| DATED: _____________ 2026 | DARREN TESTA<br>______________________________<br>Darren Testa |
| DATED: _____________ 2026 | GADOL FAMILY TRUST<br>______________________________<br>Bryan Gadol, as trustee of the Gadol Family Trust |

DATED: _____________ 2026

TESTA FAMILY TRUST

_______________________________
Darren Testa, as trustee of the
Testa Family Trust

# Exhibit 2

**Fill in this information to identify the case:**

Debtor 1 SIMBA IL HOLDINGS, LLC

Debtor 2 (Spouse, if filing) ______

United States Bankruptcy Court for the: Central District of California

Case number 8:25-BK-12616-MH

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

1. **Who is the current creditor?**

   Bryan Gadol
   Name of the current creditor (the person or entity to be paid for this claim)

   Other names the creditor used with the debtor ______

2. **Has this claim been acquired from someone else?**

   ☑ No
   ☐ Yes. From whom? ______

3. **Where should notices and payments to the creditor be sent?**

   Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|
| Name: Paul Jasper of Perkins Coie, LLP | Name: |
| Number Street: 505 Howard Street, Suite 1000 | Number Street: |
| City: San Francisco State: CA ZIP Code: 94105 | City State ZIP Code |
| Contact phone (415) 344-7155 | Contact phone ______ |
| Contact email pjasper@perkinscoie.com | Contact email ______ |

   Uniform claim identifier (if you use one):

   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

4. **Does this claim amend one already filed?**

   ☑ No
   ☐ Yes. Claim number on court claims registry (if known) ______ Filed on ______ MM / DD / YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**

   ☑ No
   ☐ Yes. Who made the earlier filing? ______

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☐ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 11,256,049.63. **Does this amount include interest or other charges?**

☐ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☑ Other. Describe: All of Debtor's assets, including the Property located at 1220 Red Butte Drive, Aspen, Colorado, Debtor's interests in stock of Lugano Holding Inc., and Debtor's investment accounts

**Basis for perfection:** See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ unknown

**Amount of the claim that is secured:** $ 11,256,049.63

**Amount of the claim that is unsecured:** $ 0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $____________________

**Annual Interest Rate** (when case was filed)_______%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $____________________

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: ____________________________________________

**Exhibit 2, Page 55**

12 Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

X No

__ Yes Check one

| | Amount entitled to priority |
|---|---|
| _ Domestic support obligations (Including alimony and child support) under 11 USC § 507(a)(1)(A) or (a)(1)(B) | $_______ |
| _ Up to $3,8000 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use 11 USC § 507(a)(7) | $_______ |
| _ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier 11 USC § 507(a)(4) | $________ |
| _ Taxes or penalties owed to governmental units 11 USC § 507(a)(8) | $_______ |
| _ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5) | $_______ |
| _ Other. Specify subsection of 11 USC § 507(a)(__) that applies | $_______ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## PART 3 Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is

**A** person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 **years,** or both. **18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box*

X I am the creditor

_ I am the creditor's attorney or authorized agent

_ I am the trustee, or the debtor, or their authorized agent Bankruptcy Rule 3004

_ I am a guarantor, surety, endorser, or other codebtor Bankruptcy Rule 3005

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 12/18/2025
MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

Name: Bryan (First name) — Middle name — Gadol (Last name)

Title

Company: c/o Paul Jasper at Perkins Coie LLP [redacted]
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 505 Howard Street, Suite 1000
Number Street

San Francisco (City) CA (State) 94105 (ZIP Code)

Contact phone (415) 344-7155 Email pjasper@perkinscoie.com

Fill in this information to identify the case:

Debtor 1 SIMBA IL HOLDINGS, LLC

Debtor 2 (Spouse, if filing)

United States Bankruptcy Court for the: Central District of California

Case number 8:25-BK-12616-MH

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Darren Testa
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Name: Paul Jasper of Perkins Coie, LLP
Number Street: 505 Howard Street, Suite 1000
City: San Francisco State: CA ZIP Code: 94105
Contact phone: (415) 344-7155
Contact email: pjasper@perkinscoie.com

**Where should payments to the creditor be sent?** (if different)

Name
Number Street
City State ZIP Code
Contact phone
Contact email

Uniform claim identifier (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) ______ Filed on MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☐ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ 8,146,481.53. **Does this amount include interest or other charges?**

☐ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☑ Other. Describe: All of Debtor's assets, including the Property located at 1220 Red Butte Drive, Aspen, Colorado, Debtor's interests in stock of Lugano Holding Inc., and debtor's investment accounts

**Basis for perfection:** See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ unknown

**Amount of the claim that is secured:** $ 8,146,481.53

**Amount of the claim that is unsecured:** $ 0.0 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $________

**Annual Interest Rate** (when case was filed)_______%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $________

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: ________

Exhibit 2, Page 58

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

X No

___ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ___ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $____________ |
| ___ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $____________ |
| ___ wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $____________ |
| ___ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $____________ |
| ___ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $____________ |
| ___ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $____________ |

*Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

X I am the creditor.

____ I am the creditor's attorney or authorized agent.

____ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

____ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date **12/18/2025**
MM/DD/YYYY

Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | **Darren** (First name) | (Middle name) | **Testa** (Last name) |
| Title | | | |
| Company | **c/o Paul Jasper at Perkins Coie, LLP** | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | **505 Howard Street Suite 1000** (Number Street) | | |
| | **San Francisco** (City) | **CA** (State) | **94105** (ZIP Code) |
| Contact phone | **(415) 344-7155** | Email | **pjasper@perkinscoie.com** |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**3070 Bristol St., Suite 640, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **CHAPTER 7 TRUSTEE'S MOTION FOR ORDER APPROVING COMPROMISE OF CONTROVERSY PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF JEFFREY I. GOLDEN IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **October 9, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) **October 9, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Simba IL Holdings, LLC, a Delaware limited liability company
870 Roosevelt
Irvine, CA 92618
**DEBTOR**

Honorable Mark D. Houle
United States Bankruptcy Court
Central District of California
411 W. 4th St., Ste 6135/Ctrm 6C
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ______________________________, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 9, 2026 | David M. Fitzgerald | [signature] |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Anthony Bisconti tbisconti@bklwlaw.com, 1193516420@filings.docketbird.com,docket@bklwlaw.com
Greg P Campbell ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
Max Casal mcasal@shulmanbastian.com, avernon@shulmanbastian.com;twooten@shulmanbastian.com
John B Connor jack@johnbconnor.com
Matthew Tyler Davis tdavis@kbkllp.com
Karol K Denniston karol.denniston@squirepb.com, travis.mcroberts@squirepb.com;sarah.conley@squirepb.com;karol-k-denniston-9025@ecf.pacerpro.com
Don Fisher dfisher@ptwww.com, tblack@ptwww.com
Alan J Friedman afriedman@shulmanbastian.com, lgauthier@shulmanbastian.com
Todd S. Garan ch11ecf@aldridgepite.com, TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com
George Gerro george@gerrolaw.com
Jeffrey I Golden (TR) lwerner@go2.law, kadele@go2.law;C205@ecfcbis.com
Michael D Good mgood@southbaylawfirm.com
David M Goodrich dgoodrich@go2.law, kadele@go2.law;dfitzgerald@go2.law;wggllp@ecf.courtdrive.com
Christopher J Harney charney@tocounsel.com, kmanson@tocounsel.com
Paul Jasper paul.jasper@ashurstperkins.com, david.kline@rimonlaw.com
Steven J. Katzman skatzman@bklwlaw.com, 1193516420@filings.docketbird.com,docket@bklwlaw.com
Tobias S Keller tkeller@kellerbenvenutti.com
Jordan A Kroop jkroop@pszjlaw.com, rleibowitz@perkinscoie.com
Mette H Kurth mette.kurth@pierferd.com, mette-kurth-7580@ecf.pacerpro.com
Wendy A Locke ecfcacb@aldridgepite.com, wlocke@ecf.inforuptcy.com
Richard A Marshack rmarshack@marshackhays.com, lbuchananmh@ecf.courtdrive.com;rmarshack@ecf.courtdrive.com;alinares@ecf.courtdrive.com
Ali M. Mojdehi ali.mojdehi@mgr-legal.com
John Morris jmorris@pszjlaw.com
Marisol A Nagata CDCAECF@BDFGROUP.COM
Dakota Pearce dpearce@buchalter.com, pjolley@buchalter.com;docket@buchalter.com
Matthew D Pham mpham@allenmatkins.com, mdiaz@allenmatkins.com
Jeffrey N Pomerantz jpomerantz@pszjlaw.com
Brett Ramsaur brett@ramsaurlaw.com, alecia@ramsaurlaw.com;paralegal@ramsaurlaw.com
Allison M. Rego allison.rego@mgr-legal.com
Traci L Shafroth tshafroth@kbkllp.com, staff@kbkllp.com
Leonard M. Shulman lshulman@shulmanbastian.com, bcabrera@shulmanbastian.com;yrivera@shulmanbastian.com
Timothy J Silverman tsilverman@scheerlawgroup.com, tsilverman1@ecf.courtdrive.com
Edward A Treder cdcaecf@bdfgroup.com
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov